

ENTER NO JS-6 SEND

FILED
CLERK, U S DISTRICT COURT

JUN 1 4 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT

JUN 1 5 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOPHIA STEWART, | ) CASE NO. CV 03-2873 MMM (VBKx) |
| Plaintiff, | ) |
| vs. | ) ORDER GRANTING THE TERMINATOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND THE MATRIX DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| ANDY WACHOWSKI, et al., | ) |
| Defendants. | ) |

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

Plaintiff Sophia Stewart alleges that defendants Twentieth Century Fox Film Corporation, James Cameron and Gale Anne Hurd  (collectively, the "Terminator Defendants") willfully infringed her copyrighted literary works by making and distributing The Terminator ("Terminator 1"), Terminator 2: Judgment Day ("Terminator 2") and Terminator 3: Rise of the Machines ("Terminator 3").[1] Stewart similarly alleges that defendants Warner Bros. Entertainment, Inc., Andy Wachowski, Larry Wachowski, Joel Silver, and Thea Bloom (collectively, the "Matrix Defendants") willfully infringed her copyrighted literary works by making and distributing The Matrix ("Matrix 1"), The Matrix Reloaded ("Matrix 2"), and The Matrix Revolutions ("Matrix

---

[1]Second Amended Complaint ("Complaint"), ¶ 64.

3").[2]  Stewart asserts claims for copyright infringement, declaratory relief, and violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961, et seq.[3]  In separately filed motions, the Terminator Defendants and the Matrix Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The court addresses both motions in this order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    Stewart's Copyrighted Works

Virtually every fact in this action is disputed.  Plaintiff Sophia Stewart is a screenwriter who works under the pseudonyms Zenia Kavala[4] and Sonya Stewart.[5]  Stewart's complaint alleges that, on or about May 1, 1981, she created a six-page screen treatment titled "The Third Eye," which was a "scientific account of futuristic life."[6]  It further alleges that, on or about November 1, 1983, Stewart created a "45-page instrument" titled "The Third Eye."[7]  The complaint identifies the title of both works as "The Third Eye" rather than "Third Eye."  Stewart registered a copyright in the six-page treatment on February 2, 1983, and a copyright in the 45-page instrument on February 6, 1984.[8]

---

[2]*Id.*

[3]*Id.*, ¶¶ 66-131.

[4]*Id.*, ¶ 2.

[5]See *id.*, Exh. 4 at 2.

[6]*Id.*, ¶ 16; The Terminator Defendants' Motion For Summary Judgment ("Terminator Defs.' Mot.") at 5; The Matrix Defendants' Motion For Summary Judgment ("Matrix Defs.' Mot.") at 5.

[7]Complaint, ¶ 17.

[8]*Id.*, ¶ 2, Exhs. 1, 3.

2

## B.    Allegations Against The Terminator Defendants

Stewart asserts that, in May 1981, she mailed the six-page treatment to Susan Merzback, Vice-President of Creative Affairs for Twentieth Century Fox Film Corporation.[9]  She also contends that, in response to an October 1983 telephone call from Fox seeking submission of the completed work, she mailed the completed manuscript to Fox's David Madden.[10]  For the next year and a half, Stewart and her agent, Ester Duffie, purportedly communicated with Fox employees, and made several attempts to submit the manuscript for the studio's consideration. Fox allegedly advised Stewart by mail that it could not accept the manuscript unless it was submitted by an agent registered with the Writer's Guild of America.[11]

Stewart contends that James Cameron and Gale Ann Hurd "act[ed] in concert with Twentieth Century [Fox]" in releasing Terminator 1, Terminator 2, and Terminator 3.  She alleges that Fox was an investor in each of the Terminator films, and that it had a role in writing, producing and distributing them.[12]  She further asserts that each infringes her copyrighted works.[13]

The Terminator Defendants counter that no person connected with the creative process that led to production of the Terminator films – including Cameron and Hurd – had access to Stewart's "Third Eye" literary materials.[14]  Although they concede that Fox had access to the Third Eye materials in the 1980's, defendants assert that Fox was not involved in creating or producing Terminator 1, 2, and 3.[15]  Defendants also contend that neither Cameron nor Hurd had any

---

[9]*Id.*, ¶ 19.

[10]*Id.*, ¶ 21.

[11]*Id.*, ¶¶ 21-23.

[12]*Id.*, ¶ 53.

[13]*Id.*, ¶¶ 50-52.

[14]Statement of Uncontroverted Facts And Conclusions Of Law As Submitted By The Terminator Defendants ("Terminator Defs.' Facts"), ¶¶ 1-4.

[15]*Id.*, ¶ 5.

1   relationship with Fox until after the release of Terminator 1,[16] and that Cameron completed the

2   Terminator 1 screenplay in October 1982,[17] before Stewart finished the Third Eye manuscript.

3   Finally, defendants assert that Stewart's claims fail because she cannot establish that her works

4   are substantially or strikingly similar to Terminator 1, 2, and 3.[18]

5   **C.   Allegations Against The Matrix Defendants**

6   As respects the Matrix Defendants, Stewart alleges that, in the summer of 1986, she sent

7   her six-page treatment and 45-page instrument to Andy and Larry Wachowski in response to an

8   advertisement in a national magazine seeking works of science fiction.[19]   Stewart asserts that,

9   although the Wachowskis received the submission, they did not contact her or return the

10   copyrighted works.[20]

11   In March 1999, the Wachowskis, allegedly "acting in concert with Silver, Warner Bothers

12   and Bloom," produced and distributed a film and comic book series titled "The Matrix."[21]   That

13   same month, Stewart allegedly discovered that the film and comic book series infringed her

14   copyrights in the treatment and the 45-page instrument.[22]   As a result, she communicated with

15   Warner Brothers and the Wachowskis, demanding that they cease their infringing activities.[23]

16   Stewart asserts that she continued to correspond with Warner Brothers about her claim through

17   February 2001.[24]   She contends that the Wachowskis, "acting in concert with Silver, Warner

18   _____

19   [16]*Id.*, ¶¶ 8,9.

20   [17]*Id.*, ¶ 14.

21   [18]*Id.*, ¶¶ 19-20.

22   [19]Complaint, ¶¶ 24-26.

23   [20]*Id.*, ¶ 26.

24   [21]*Id.*, ¶¶ 27-28.

25   [22]*Id.*, ¶ 29.

26   [23]*Id.*, ¶¶ 29, 31, 37.

27   [24]*Id.*, ¶¶ 39-42, 45.

28

1   Brothers and Bloom," released Matrix 2 and Matrix 3 as sequels, and that each was based on her

2   copyrighted works.[25]  On June 10, 1999, Stewart filed a written complaint with the Federal

3   Bureau of Investigation, charging that the Wachowskis, Silver, Warner Brothers, and others had

4   infringed her copyrights.[26]  Apparently, she at some point also charged that Terminator 1, 2 and

5   3 infringed her copyrights.[27]

6          The Matrix defendants contend that the Wachowskis independently created Matrix 1, 2,

7   and 3,[28] and that none of them had access to Stewart's Third Eye literary materials.[29]  Defendants

8   dispute Stewart's allegation that the Wachowskis placed an advertisement soliciting works of

9   science fiction in a magazine in 1986, and further dispute that Stewart mailed her literary works

10  to the Wachowskis.[30]  Defendants assert that the purported similarities between the Third Eye

11  literary materials and the Matrix films do not rise to the level of protectable expression.[31]  They

12  also contend that the Third Eye literary materials are neither substantially nor strikingly similar

13  to the Matrix films.[32]

14

15

16          [25]*Id.*, ¶¶ 46-47.

17          [26]*Id.*, ¶ 43.

18          [27]See Declaration of Sophia Stewart In Support Of Plaintiff's Opposition To The
19  Terminator Defendants' Summary Judgment Motion ("Stewart Terminator Decl."), ¶ 8
    (indicating that the FBI confirmed her suspicions that both the Matrix and Terminator trilogies
20  were copied from her works).  In a separate order, the court grants defendants' motion to preclude
    plaintiff's testimony pursuant to Rule 37(b)(2)(B) of the Federal Rules of Civil Procedure.  Any
21  references in this order to Stewart's declarations, therefore, are by way of background or in aid
22  of an alternative ruling on the issues presented by defendants' motion.

23          [28]Statement Of Uncontroverted Facts And Conclusions Of Law As Submitted By The
    Matrix Defendants ("Matrix Defs.' Facts"), ¶ 10.
24
25          [29]*Id.*, ¶¶ 1-2, 9.

26          [30]*Id.*, ¶¶ 3-5.

27          [31]*Id.*, ¶ 17.

28          [32]*Id.*, ¶¶ 21-22.

### D.   Identifying Stewart's Protected Materials

As a threshold matter, the court must determine which works constitute Stewart's copyrighted "Third Eye" literary materials.  The operative complaint alleges:

> "Stewart is the legal and beneficial federal copyright claimant, owner, and author of the following intellectual property: (1) 'The Third Eye,' United States Copyright Office Registration Number Txu 117-610, effective date of registration, **2 February 1983**, attached hereto and incorporated herein as **Exhibit 1**; (2) **'The Third Eye,'** which . . . work was completed **1 May 1981**, attached hereto and incorporated herein as **Exhibit 2** (the work for the created epic manuscript was completed in **1983**, and includes the entire text (original story), the original treatment for a motion picture, which is the document referenced in **Exhibit 1**); (3) 'The Third Eye' (add on manuscript), United States Copyright Number Txu 154-281, **6 February 1984**, attached hereto and incorporated herein by reference as **Exhibit 3** (which includes the add on manuscript, by Sophia Stewart under her pseudonym Zenia Kavala, the original draft, graphic illustrations, character analysis, synopsis; and (4) **"The Makings of The Third Eye,"** which is attached hereto and incorporated herein by reference as **Exhibit 4**."[33]

The exhibits attached to the complaint do not track this allegation.  Exhibit 1 is a copyright registration for a work titled "Third Eye" by Sophia Stewart.  Exhibit 3 is a copyright registration for a work titled "Third Eye (Add-on Manuscript)" by Sophia Maciél Stewart/Zenia Kavala.[34]  Exhibit 2 is the six-page treatment,[35] and Exhibit 4 – which is identified in paragraph 2 as "The Makings of The Third Eye" – is in fact a 47-page manuscript accompanied by a table of contents,

---

[33]Complaint, ¶ 2 (emphasis original).

[34]*Id.*, Exhs. 1, 3.

[35]*Id.*, Exh. 2.

forward, preface and introduction.[36]  Although the complaint alleges that "'The Third Eye' (add on manuscript)" includes, *inter alia*, "the original draft, graphic illustrations, character analysis, [and] synopsis," none of the exhibits includes these items.  Similarly, although the complaint states that a document titled "The Makings of The Third Eye" is attached, no exhibit bearing that title is included.  Finally, although the complaint consistently refers to Stewart's works as "The Third Eye," the treatment and the 47-page manuscript attached as exhibits bear the title "Third Eye."

In her opposition to the pending motions, Stewart now contends that "there are three sets of documents which make up [her] protected literary works."[37]  These are

1.     "Third Eye" by Sophia Stewart consisting of a 6-page treatment.

2.     "The Third Eye" by Zenia Kavala consisting of (i) a 2-page synopsis, (ii) a single page character list, (iii) a 2-page "character analysis," (iv) 5 pages of illustrations, (v) a single page outline of the manuscript titled "The Making of The Third Eye," (vi) and the "original" manuscript consisting of 29 pages of text, plus 5 pages containing the title page, table of contents, forward, preface and introduction.

3.     "Third Eye" by Sonya Stewart, a manuscript consisting of a table of contents, forward, preface, introduction, and a 47-page manuscript.[38]

The court will refer to the first document as the treatment, to the third document as the 47-page manuscript, and to the components of the second set of documents as (i) the synopsis, (ii) the character list, (iii) the character descriptions, (iv) the illustrations, (v) "The Making of The Third

---

[36]*Id.*, Exh. 4.  Although the last page of the manuscript is numbered 47, the manuscript starts with page 2.  As a result, the document has 46 rather than 47 pages.

[37]Plaintiff's Opposition To The Terminator Defendants' Motion For Summary Judgment ("Pl.'s Terminator Opp.") at 3.

[38]*Id.* at 2-3.

Eye,"[39] and (vi) the 29-page manuscript.  Although Stewart attached only the first and third documents to her complaint, the complaint references the second document and its components, identifying the document by various names, including: "'The Third Eye' (add on manuscript),"[40] "a 45 page instrument,"[41] the "Epic Science Fiction Manuscript,"[42] and "plaintiff's federal copyright protected complete 45 page 'The Third Eye' Epic Science Fiction Manuscript."[43]  A careful reading of the complaint reveals that the 45-page document includes the original draft of Stewart's full manuscript, graphic illustrations, character descriptions, and a synopsis.[44]  It is unclear whether"The Making of The Third Eye" is part of the 45-page instrument or a separate document.[45]  For ease of reference, the court refers to the entire collection of documents, including "The Making of The Third Eye," as the "45-page instrument."[46]  The 29-page manuscript included in the 45-page instrument differs in only minor respects from the 47-page manuscript.

### E.     The Pending Action

Stewart filed this action on April 24, 2003.  On July 14, 2004, she filed a first amended complaint.  On September 27, 2004, the court granted defendants' motion to dismiss Stewart's

---

[39]As alleged in the complaint, the title of this document is, "The Makings of The Third Eye."  Plaintiff's filings in opposition to the motions for summary judgment, however, use the term, "The Making of The Third Eye."

[40]Complaint, ¶ 2.

[41]*Id.*, ¶ 17.

[42]*Id.*

[43]*Id.*, ¶ 26.

[44]*Id.*, ¶¶ 2, 26.

[45]Compare *id.*, ¶ 2 (identifying "The Making[ ] of The Third Eye" as a separate document) with ¶ 26 (stating that "The Making[ ] of The Third Eye" is part of the 45-page document).

[46]See Complaint, ¶ 17 (referring to this compilation of literary and artistic works as "a 45 page instrument.")

1   RICO claims with leave to amend.  On January 3, 2005, Stewart filed a second amended

2   complaint.  Defendants once again moved to dismiss Stewart's RICO causes of action.

3   Concurrently with this order, the court grants that motion.  Alternatively, as set forth in this

4   order, it finds that defendants are entitled to judgment on the RICO claims because no triable

5   issues of fact remain regarding the copyright infringement on which certain of the RICO claims

6   are based.

7

8                                    **II. DISCUSSION**

9   **A.     Legal Standard Governing Summary Judgment**

10      A motion for summary judgment must be granted when "the pleadings, depositions,

11   answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

12   there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

13   as a matter of law."  FED.R.CIV.PROC. 56(c).  A party seeking summary judgment bears the

14   initial burden of informing the court of the basis for its motion and of identifying those portions

15   of the pleadings and discovery responses that demonstrate the absence of a genuine issue of

16   material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party

17   will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that

18   no reasonable trier of fact could find other than for the moving party.  On an issue as to which

19   the nonmoving party will have the burden of proof, however, the movant can prevail merely by

20   pointing out that there is an absence of evidence to support the nonmoving party's case.  See *id.*

21   If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or

22   as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."

23   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986);  FED.R.CIV.PROC. 56(e).

24      In judging evidence at the summary judgment stage, the court does not make credibility

25   determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most

26   favorable to the nonmoving party.  See *T.W. Electric Service, Inc. v. Pacific Electric Contractors*

27   *Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  The evidence presented by the parties must be

28

1   admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving

2   papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Nelson*

3   *v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and

4   speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub.*

5   *Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

6   **B.    Standard Governing Copyright Infringement Claims**

7       "Copyright law protects an author's expression; facts and ideas within a work are not

8   protected." *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990); see also *Sid & Marty Krofft*

9   *Television Productions v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977) ("It is an

10  axiom of copyright law that the protection granted to a copyrighted work extends only to the

11  particular expression of the idea and never to the idea itself").

12      The Copyright Act vests a copyright owner with the exclusive right to reproduce, distribute

13  copies of, and prepare derivative works based upon the copyrighted work. 17 U.S.C. § 106.

14  Violation of any of the rights granted under § 106 constitutes infringement. See *Teleprompter*

15  *Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 398, n. 2 (1974) ("Although the

16  Copyright Act does not contain an explicit definition of infringement, it is settled that

17  unauthorized use of copyrighted material inconsistent with the 'exclusive rights' enumerated

18  [therein], constitutes copyright infringement under federal law"), superseded by statute on other

19  grounds as recognized in *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984); *Cormack v.*

20  *Sunshine Food Stores, Inc.*, No. 84CV2963DT, 1987 WL 46890, * 2 (E.D. Mich. May 1, 1987)

21  ("By its literal terms, the Copyright Act gives a copyright holder the 'exclusive' right to

22  reproduce or authorize reproduction of the copyrighted work. 17 U.S.C. § 106(1). The Act

23  defines an infringer as 'anyone who violates the exclusive rights of the copyright owner. . . .' 17

24  U.S.C. § 501(a)"); *SBK Catalogue Partnership v. Orion Pictures Corp.*, 723 F. Supp. 1053,

25  1063 (D.N.J. 1989) ("Under § 501(a), any unauthorized use of copyrighted material which is

26  inconsistent with the exclusive rights enumerated in § 106 (i.e., by using or authorizing the use

27  of the copyrighted work in one of the five ways set forth in the statute) constitutes copyright

28  infringement").

1    To prevail on a copyright infringement claim, a plaintiff must show (1) ownership of a

2 valid copyright and (2) copying of the original elements of the protected work. See *Feist*

3 *Publications v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991); *Kling v. Hallmark*

4 *Cards, Inc.*, 225 F.3d 1030, 1037 (9th Cir. 2000); *Kouf v. Walt Disney Pictures & Television*,

5 16 F.3d 1042, 1043, n. 2 (9th Cir. 1994). Absent direct evidence of copying, the second element

6 of the claim requires a fact-based showing that defendant had "access" to plaintiff's work and that

7 the two works are "substantially similar." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481

8 (9th Cir. 2000) (quoting *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996)), cert. denied, 531

9 U.S. 1126 (2001). Where evidence of access is lacking, a "striking similarity" between the works

10 may give rise to a permissible inference of copying. See *Three Boys Music*, *supra*, 212 F.3d at

11 485 ("in the absence of any proof of access, a copyright plaintiff can still make out a case of

12 infringement by showing that the songs were 'strikingly similar'"); *Onofrio v. Reznor*, 208 F.3d

13 222, 2000 WL 206576, * 1 (9th Cir. Feb. 23, 2000) (Unpub. Disp.) ("Without any showing of

14 access, Onofrio can only prevail by establishing that Reznor's songs are 'strikingly similar' to the

15 protected elements in his songs"); *Baxter v. MCA, Inc.*, 812 F.2d 421, 424, n. 2 (9th Cir.)

16 ("Proof of striking similarity is an alternative means of proving 'copying' where proof of access

17 is absent"), cert. denied, 484 U.S. 954 (1987); see also *Herzog v. Castle Rock Entertainment*, 193

18 F.3d 1241, 1249 (11th Cir. 1999) ("If the plaintiff cannot show access, the plaintiff may still

19 prevail by demonstrating that the works are so strikingly similar as to preclude the possibility of

20 independent creation"); *Smith*, *supra*, 84 F.3d at 1219 (citing *Baxter* and noting that "establishing

21 access eliminates the need for a plaintiff to establish a 'striking similarity' between plaintiff's and

22 defendant's work").

23    The Terminator Defendants assert that they are entitled to summary judgment because

24 (1) Stewart cannot establish that Hurd or Cameron had access to the Third Eye literary materials;

25 (2) she cannot establish that Fox had any role in creating, writing, developing, financing or

26 producing the Terminator films; (3) the protectable expression in the Third Eye literary materials

27 is not substantially or strikingly similar to the protectable expression in the Terminator films;

28 (4) the screenplay for Terminator 1 was completed before Stewart finished a complete draft of her

1  Third Eye manuscript; (5) Stewart's claims are barred by the statute of limitations and the doctrine

2  of laches; and (6) Stewart's RICO claims fail because they are based on allegations of copyright

3  infringement.

4       The Matrix Defendants contend that they are entitled to summary judgment because

5  (1) Stewart cannot present evidence raising a triable issue of fact regarding their access to her

6  writings prior to the creation of the Matrix 1, and (2) Stewart cannot present evidence raising a

7  triable issue of fact regarding the substantial or striking similarity of her works and Matrix 1, 2,

8  and 3.

9       **C.**     **Whether The Terminator And Matrix Defendants Are Entitled To Summary**

10            **Judgment On Stewart's Copyright Infringement Claims**

11       The Terminator and Matrix Defendants do not dispute Stewart's allegation that she owns

12  a valid copyright. Rather, they contend that no triable issue of fact exists as to whether they

13  copied her protected works. Stewart can prevail at trial only if she produces evidence showing

14  (1) that defendants had "access" to her works and that the Terminator and Matrix films are

15  "substantially similar" to those works; or (2) evidence that the accused films are "strikingly

16  similar" to her works.

17       **1.**     **Whether Stewart Has Raised A Triable Issue Of Fact Regarding Access**

18       To prove access, Stewart must show that defendants had "an opportunity to view or to

19  copy [her] work." *Three Boys Music, supra,* 212 F.3d at 482; see also *Sid & Marty Krofft,*

20  *supra,* 562 F.2d at 1172. To do so, she must demonstrate that there is a "reasonable possibility"

21  or "reasonable opportunity" defendants were able to view her works, not simply a "bare

22  possibility" they did so. See *Three Boys Music, supra,* 212 F.3d at 482; *Meta-Film Associates*

23  *v. MCA,* 586 F. Supp. 1346, 1355 (C.D. Cal. 1984).

24       Stewart can prove that there is a "reasonable possibility" defendants had access through

25  circumstantial evidence "in one of two ways: (1) a particular chain of events is established

26  between the plaintiff's work and the defendant's access to that work . . . , or (2) the plaintiff's

27  work has been widely disseminated." *Three Boys Music, supra,* 212 F.3d at 482. "Where the

28  copyrighted work has only been published to a limited audience, . . . access cannot be inferred

1   absent evidence that the defendants had a reasonable opportunity to view the work." *Repp v.*

2   *Lloyd Webber*, 858 F. Supp. 1292, 1301 (S.D.N.Y. 1994), rev'd. on other grounds, 132 F.3d

3   882 (2d Cir. 1997); see See also *Jason v. Fonda*, 526 F. Supp. 774, 776-77 (C.D. Cal. 1981) (the

4   fact that two to seven hundred copies of plaintiff's book were available in Southern California

5   bookstores "creates no more than a 'bare possibility' that defendants may have had access to

6   plaintiff's book"), aff'd., 698 F.2d 966 (9th Cir. 1982).

### a.     The Terminator Defendants

8       The Terminator Defendants concede that Fox had access to Stewart's protected works in

9   the 1980's when Stewart sent a copy of the six-page treatment to Fox's Vice President of Creative

10   Affairs and a copy of her completed manuscript to David Madden.  They contend, however, that

11   no triable issue exists regarding the "access" prong of Stewart's copyright infringement claim,

12   since no one at Fox was involved in creating, writing, developing or producing any of the

13   Terminator films.  Although Cameron and Hurd were involved in the creative process for

14   Terminator 1 and 2, defendants contend there is no triable issue of fact regarding the fact that they

15   did not have access to Stewart's works.  Defendants rely, in part, on Stewart's admissions.

16   Defendants' requests for admission defined "The Third Eye" to "mean and refer to the 6-page

17   treatment and/or the approximately 47-page manuscript both [ ]titled 'The Third Eye.'"[47]

18   Stewart's admissions regarding "The Third Eye" thus pertain to the treatment and the 47-page

19   manuscript.[48]

20

---

21       [47]See Declaration of David H. Boren In Support Of (1) The Matrix Defendants' Notice Of

22   Motion And Motion For Summary Judgment Pursuant To Fed.R.Civ.Proc. 56; (2) The
      Terminator Defendants' Notice Of Motion And Motion For Summary Judgment Pursuant To

23   Fed.R.Civ.Proc. 56; (3) Defendants' Motion To Dismiss Plaintiff's Second Amended
      Complaint, With Prejudice Pursuant To Fed.R.Civ.Proc. 41(b); And Defendants' Motion To

24   Preclude Plaintiff's Testimony Pursuant To Fed.R.Civ.Proc. 37(d).  ("Boren Decl."), Exh. S

25   at 204.

26       [48]Stewart challenges this conclusion, asserting that her six-page treatment and the 47-page

27   manuscript are both "clearly [ ]titled 'Third Eye'" rather than "The Third Eye."  (Pl.'s
      Terminator Opp. at 4.)  The identity of the documents to which the admissions pertain is clear.

28   The admissions describe the two literary works attached to Stewart's complaint.  To the extent

Stewart's admissions establish that: (1) no person at Fox was involved in any way in creating, writing, developing or producing Terminator 1, 2, or 3;[49] (2) Stewart "ha[s] no factual basis or evidence to support the allegation that Fox provided Cameron a copy" of the treatment or the 47-page manuscript;[50] (3) Stewart "ha[s] no factual basis or evidence to support the allegation that Fox provided Hurd a copy" of the treatment or the 47-page manuscript;[51] (4) Stewart "ha[s] no factual basis or evidence to support the contention that Fox provided any person connected with" Terminator 1, 2, or 3 a copy of the treatment or the 47-page manuscript;[52] (5) Cameron did not have access to the treatment or the 47-page manuscript;[53] and (6) Hurd did not have access to the treatment or the 47-page manuscript.[54]

In addition to relying on Stewart's admissions, defendants proffer evidence showing that the individuals who created the Terminator films did not have access to Stewart's protected works. In his declaration, Cameron states that he has never seen, read, received or had access to Stewart's "Third Eye Literary Materials."[55] He asserts that he has never met with or spoken to

---

any confusion is created by the inclusion of the indefinite article "the," it began when Stewart repeatedly alleged in her complaint that the copyrighted works were titled "The Third Eye." (See Complaint, ¶¶ 2, 16-19, 22, 23, 26, 30, 44, 64.)

[49]Boren Decl., Exh. S at 206-07.

[50]*Id.* at 207.

[51]*Id.* at 207.

[52]*Id.* at 208.

[53]*Id.* at 229.

[54]*Id.* at 249.

[55]Declaration Of James Cameron In Support Of The Terminator Defendants' Motion For Summary Judgment ("Cameron Decl."), ¶¶ 3, 5-8. Stewart objects to paragraph 3 of Cameron's declaration on the relevance hearsay, and best evidence grounds. The paragraph reads:
> "As I understand it, Plaintiff Sophia Stewart . . . alleges in her lawsuit that she wrote: (1) a six-page treatment entitled the 'Third Eye,'; (2) a forty-five page manuscript entitled the 'Third Eye;' and (3) an additional document which Stewart calls the 'Making of the Third Eye' (collectively, the 'Third Eye Literary

1    Stewart, and that he had not heard of Stewart prior to the time she filed suit against him.[56]

2

3           Materials')."

4    Although Cameron's testimony apparently relies on the allegations of Stewart's complaint, which
     are hearsay under the Federal Rules of Evidence when offered for the truth of the matter asserted

5    (see *Century "21" Shows v. Owens*, 400 F.2d 603, 609-10 (8th Cir. 1968); *T.I. Construction Co.,
     Inc. v. Kiewit Eastern Co.*, Civ. A. No. 91-2638,, 1992 WL 382306, * 4 (E.D. Pa. Dec. 10,

6    1992)), Stewart cannot raise such an objection here for two reasons. First, "any pleading may

7    be used against the pleader as an admission of the facts stated therein." *Century "21" Shows*,
     *supra*, 400 F.2d at 610. Second and more fundamentally, Cameron does not offer the allegations

8    for their truth, i.e., to prove that Stewart is the author of the works. Rather, he offers the
     allegations to describe his understanding of Stewart's claim. Because they are not offered for the

9    truth, the statements are not inadmissible hearsay. See FED.R.EVID. 801(c). They are relevant,

10   moreover, because they concern the subject matter of Stewart's lawsuit, and provide a definition
     of the term, "Third Eye Literary Materials" as it is used in subsequent paragraphs of the

11   declaration detailing Cameron's lack of access to the works. Stewart's best evidence objection

12   also fails. The best evidence rule is inapplicable because Cameron's testimony is not offered to
     prove the contents of a writing. See FED.R.EVID. 1002. See *United States v. Mayan*, 17 F.3d

13   1174, 1184-85 (9th Cir. 1994) (holding that the trial court erred in sustaining best evidence

14   objections to questions regarding witnesses' understanding of the terms of written plea
     agreements). Accordingly, Stewart's objection to paragraph 3 of the Cameron declaration is

15   overruled. For the same reasons, their objections to identical paragraphs in the declarations of
     Hurd, Laurence Wachowski, and Andy Wachowski are also overruled.

16          Cameron and Hurd define the "Third Eye Literary Materials" that they reference in their

17   declarations as "(1) a six-page treatment [ ]titled the 'Third Eye,'; (2) a forty-five page manuscript
     [ ]titled the 'Third Eye;' and (3) an additional document which Stewart calls the 'Making of the

18   Third Eye.'" Cameron and Hurd thus assert that they have never seen, read, received or had

19   access to the six-page treatment, the 45-page instrument, or the single page "Making of The Third
     Eye." Their terminology is consistent with that used in Stewart's complaint, which denominates

20   a document comprised of an "original" draft, synopsis, illustrations, and character descriptions

21   as "a 45 page instrument" or "45 page manuscript." Although Hurd and Cameron describe the
     "Making of the Third Eye" as a separate document, while Stewart now asserts that "The Making

22   of The Third Eye" is part of the 45-page instrument, the complaint contains inconsistent
     allegations regarding inclusion of the document in the 45-page instrument. (Compare Complaint,

23   ¶ 2 with *id.*, ¶ 26.) As previously discussed, the court attaches no significance to the presence

24   or absence of the article "the" in the parties' description of the works, since both plaintiff and
     defendants have used the titles "The Third Eye" and "Third Eye" interchangeably to refer to a

25   single document.

26          [56]*Id.*, ¶ 4. Stewart contends that Cameron's statement that he has never met with or spoken

27   to her, and that he had not heard of her prior to the time she filed suit is irrelevant. The statement
     is clearly relevant to the issue of access, however. See *Reno v. Bossier Parish Sch. Bd.*, 520 U.S.

28   471, 487 (1997) ("Evidence is 'relevant' if it has 'any tendency to make the existence of any fact

Cameron states that the screenplay for Terminator 1 was completed in October 1982, prior to the date Stewart allegedly completed the full manuscript of Third Eye.[57]  He also asserts that he had no business, working or other relationship with Fox during the period he created, wrote, developed, sought financing for, and directed the film, or at any time prior to October 1984.[58]

Hurd has also submitted a declaration stating that she has never seen, read, received or had access to the "Third Eye Literary Materials."[59]  Hurd asserts that she has never met with or spoken to Stewart, and that she had not heard of Stewart prior to the time Stewart sued her for copyright infringement.[60]  She states that she had no business, working or other relationship with Fox during the period she created, wrote, developed, sought financing for, and directed Terminator 1, or at any time prior to October 1984.[61]

Finally, Mark E. Meyerson, Fox's Vice President of Legal Affairs has submitted a declaration stating that Fox "played no role, and had no involvement whatsoever, in creating, writing, developing, financing or producing" any of the Terminator films.  Rather, "after 'Terminator 1' was a completed picture, and after 'Terminator 2' was a completed picture, Fox . . . acquire[d] some limited distribution rights with respect to those two pictures."[62]  Meyerson

---

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence,'" quoting FED.R.EVID. 401).  Accordingly, the court overrules Stewart's objections to this paragraph and to identical paragraphs in the declarations of Hurd, Laurence Wachowski, and Andy Wachowski.

[57]Complaint, ¶ 2; see also Stewart Terminator Decl., ¶ 4.

[58]Id., ¶¶ 10, 11, 12, 23.

[59]Declaration Of Gale Ann Hurd In Support Of The Terminator Defendants' Motion For Summary Judgment ("Hurd Decl."), ¶¶ 3, 5-8.

[60]Id., ¶ 4.

[61]Id., ¶¶ 10-12.

[62]Declaration Of Mark E. Meyerson In Support Of The Terminator Defendants' Motion For Summary Judgment ("Meyerson Decl."), ¶ 4.  Meyerson details the distribution rights Fox acquired as follows: (1) in the mid-1980's, Fox entered into a license agreement with Orion Pictures, pursuant to which it obtained limited rights to distribute videocassettes of Terminator

1   asserts that Fox has had no involvement whatsoever with Terminator 3.[63]

2       Coupled with Stewart's admissions, these declarations are evidence that the makers of

3   Terminator 1, 2, and 3 did not have access to Stewart's protected literary works,[64] and created

4   the films independently.  Stewart, who bears the burden of proof on this issue, must therefore

5   adduce contradictory evidence that raises a triable issue of fact regarding access.  The only

6   evidence Stewart proffers regarding access is her own declaration and certain documents attached

7   thereto.   In a separate order, the court has precluded Stewart from offering testimony in

8   opposition to defendants' motions for summary judgment.  Thus, none of the evidence she submits

9   may be considered, and no triable issue of fact defeating summary judgment has been raised.

10      Even were the court to consider Stewart's declaration and exhibits, moreover, it would

11  conclude that she had failed to raise a triable issue of fact regarding access.  Stewart asserts that

12  she sent her six-page treatment to Fox in May 1981, and her "manuscript" to Fox in November

13  1983.[65]  She contends that Fox employees Susan Meszbach and David Madden, who had access

14  to her literary works, later went to work at Paramount, and that Paramount "owns Terminator."[66]

15

16

17  _____

18  1 in certain foreign countries through 1989 (*id.*, ¶ 8); (2) in 1998 and 1999, Fox entered into
    license agreements with two other companies, pursuant to which it obtained the right to distribute

19  videocassettes and DVDs of Terminator 1 and 2 in certain domestic and foreign territories (*id.*,

20  ¶ 7.)

21      [63]*Id.*, ¶ 9.

22      [64]Stewart's admissions conclusively establish that neither Cameron, Hurd, nor any other
    person connected with Terminator 1, 2, or 3 had access to the six-page treatment or 47-page

23  "Third Eye" manuscript.  The declarations submitted by Cameron and Hurd establish that they
    did not have access to Stewart's 45-page manuscript, which included the original draft, synopsis,

24  illustrations and character descriptions.

25      [65]See Pl.'s Terminator Opp. at 9-10; Stewart Terminator Decl., ¶ 4.  The "manuscript"

26  to which Stewart refers appears to be the 45-page instrument, including the one-page "The
    Making of the Third Eye," as this is the document attached as Exhibit 2 to Stewart's declaration.

27

28      [66]Stewart Decl., ¶ 6.

1    The latter assertion lacks foundation,[67] and cannot be considered in deciding defendants' summary

2    judgment motion.  See FED.R.CIV.PROC. 56(e).  Stewart, moreover, fails to indicate when

3    Meszbach and Madden went to Paramount, and fails to adduce evidence that Paramount had any

4    role in creation of the Terminator films.[68]  She also provides no evidence from which a trier of

5    fact could infer that Paramount provided copies of the "Third Eye" to Cameron and/or Hurd.

6

7

8    [67]The Terminator Defendants object to Stewart's conclusory assertions that Meszbach and
     Madden went to work for Paramount and that Paramount owns the Terminator films, *inter alia*,
9    on the basis that they are not based on personal knowledge and lack foundation.  (See The
     Terminator Defendants' Objections to, and Motion to Strike Portions of the Declarations of
10   Sophia Stewart Filed in Opposition to Their Motion for Summary Judgment ("Terminator
     Defendants' Objections"), ¶ 4.)  As a person working in the entertainment industry, Stewart has
11   sufficient personal knowledge to testify to the fact that Meszbach and Madden left Fox and went
     to Paramount.  See *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2001) ("Griesbach's five-year
12   tenure as Arrow's credit manager lends support to his claim of 'personal knowledge' of industry
     practice"); *E.E.O.C. v. Catholic Knights Ins. Soc.*, 915 F.Supp. 25, 27 (N.D. Ill. 1996)
13   ("Sheedy's testimony is admissible because he held a position in which he would be expected to
     know the amount of control Catholic Knights exhibited over the insurance agents.  That Sheedy
14   was fired and that Sheedy did not occupy the position for almost a year before the relevant time
     are factors that go to the weight of the evidence, not its sufficiency").  She does not, however,
15   demonstrate that she personally knows the identity of the owner of the Terminator films, and
16   offers only a conclusory assertion in this regard.  See *Travelers Casualty and Surety Co. of
     America v. Telstar Construction Co., Inc.*, 252 F. Supp. 2d 917, 924 (D. Ariz. 2003) ("Plaintiff
17   provides no facts establishing Mausolf possessed the legal requisite of personal knowledge of the
     information contained in Exhibit 1.  Instead, Plaintiff argues the Court should assume personal
18   knowledge based on a conclusory statement by Mausolf.  Such conclusory affidavits fail to
19   establish foundation"); *Farris v. McNicols*, No. 00CV7387, 2001 WL 1740250, * 4, n. 5 (N.D.
     Ohio Dec. 5, 2001) ("The affidavit is of dubious admissibility here.  The affiant's conclusory
20   reference to 'personal knowledge' fails to show the basis for his 'knowledge' – i.e., that he is a
21   competent witness").  Defendants' objection to this portion of the paragraph is therefore
     sustained.
22       The Terminator Defendants, moreover, have adduced admissible evidence that Paramount
23   *does not* "own" the Terminator films.  (See Declaration Of Gale Anne Hurd In Support Of The
24   Terminator Defendants' Reply To Plaintiff Sophia Stewart's Opposition To Their Motion For
     Summary Judgment ("Hurd Reply Decl."), ¶ 5 ("Paramount does not own 'The Terminator' or
25   any of its sequels.  I receive participation statements in connection with 'The Terminator' and
26   those participation statements are not sent by Paramount").)

27

28   [68]According to evidence submitted by defendants, the original Terminator film was co-
     produced by Hemdale Film Corporation and Orion Pictures.  See Hurd Decl., ¶ 22.

18

1  Thus, even putting aside its inadmissibility, Stewart's assertion that Paramount owns the

2  Terminator films fails to show a chain of access through which Cameron or Hurd could have

3  gained access to her literary works.  See *Three Boys Music, supra*, 212 F.3d at 482 ("Access may

4  not be inferred through mere speculation or conjecture"); see also *Murray Hill Publications, Inc.*

5  *v. Twentieth Century Fox Film Corp.*, 361 F.3d 321 (6th Cir. 2004) ("'[a]ccess may not be

6  inferred through mere speculation or conjecture,'" quoting *Ellis v. Diffie*, 177 F.3d 503, 506 (6th

7  Cir. 1999), and 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13.02[A]);

8  *Gaste v. Kaiserman*, 863 F.2d 1061, 1066-67 (2d Cir. 1988) (although a reasonable inference of

9  access may be drawn even when plaintiff's theory of access through third parties relies "on a

10  somewhat attenuated chain of events extended over a long period of time and distance," it is not

11  sufficient to show "a bare possibility . . . inferred through speculation or conjecture"); *Tisi v.*

12  *Patrick*, 97 F. Supp. 2d 539, 547 (S.D.N.Y. 2000) ("[P]laintiffs must show 'significant,

13  affirmative and probative evidence' of a chain of access to survive a summary judgment motion

14  by the defendants").  Accordingly, even had the court not precluded Stewart from testifying, her

15  declaration would be insufficient to raise a triable issue of fact concerning transmission of her

16  works to Cameron or Hurd via Paramount employees.

17      Stewart's declaration similarly fails to raise a triable issue of fact regarding Fox's role in

18  creating, writing and developing the Terminator films.[69]  First, Stewart is barred from presenting

19  evidence that directly contradicts her admission that Fox had no role in creating, writing,

20  developing or producing Terminator 1, 2, or 3.[70]  See FED.R.CIV.PROC. 36(b) ("Any matter

21  admitted under this rule is conclusively established unless the court on motion permits withdrawal

22  or amendment of the admission"); *American Auto Ass'n. v. AAA Legal Clinic*, 930 F.2d 1117,

23  1120 (5th Cir. 1991) ("An admission that is not withdrawn or amended cannot be rebutted by

24  contrary testimony or ignored by the district court simply because it finds the evidence presented

25  by the party against whom the admission operates more credible").  Moreover, even if the

26  —————————————

27      [69]Pl.'s Terminator Opp. at 10.

28      [70]Boren Decl., Exh. S at 206-07.

1  admission were not binding, and Stewart's declaration were considered, she proffers no evidence

2  indicating that Fox participated in writing, creating or producing the Terminator films.  Stewart

3  submits (1) a March 8, 2002 Wall Street Journal article, which suggests that, following the release

4  of Terminator 2, Fox and Cameron worked collaboratively but unsuccessfully to acquire the rights

5  to make Terminator 3; and (2) a purported print-out of a web page allegedly showing that

6  Twentieth Century Fox Home Entertainment distributed Terminator 1 in Germany.[71]  Stewart

7  asserts that the Wall Street Journal article proves that Bill Mechanic, Fox's former chairman,

8  invested money in Terminator 1 and 2.[72]  Generally, newspaper articles are considered hearsay

9  under Rule 801(c) when offered for the truth of the matter asserted.  See *United States ex rel.*

10  *Woods v. Empire Blue Cross and Blue Shield*, No. 99 Civ. 4968(DC), 2002 WL 1905899, * 1,

11  n. 1 (S.D.N.Y. Apr. 19, 2002); *In re Columbia Securities Litigation*, 155 F.R.D. 466, 474

12  (S.D.N.Y. 1994) (holding that press reports were hearsay because they were out-of-court

13  statements offered to prove the truth of the matter asserted).  Even when the actual statements

14  quoted in a newspaper article constitute nonhearsay, or fall within a hearsay exception, their

15  repetition in the newspaper creates a hearsay problem.  See *Larez v. Los Angeles*, 946 F.2d 630,

16  642 (9th Cir. 1991) ("As the reporters never testified nor were subjected to cross-examination,

17  their transcriptions of Gates's statements involve a serious hearsay problem").  Thus, statements

18  in newspapers often constitute double hearsay.  See *United States Football League v. Nat'l*

19  *Football League*, 1986 WL 5803, * 2 (S.D.N.Y.  May 16, 1986) (holding that statements of

20  belief by unknown declarants reiterated in a newspaper article constituted hearsay within hearsay).

21  This is the case with respect to the article Stewart proffers.  Moreover, the only reference to

22  Mechanic in the article is a quotation from him indicating that Fox chose *not* to become involved

23  in Terminator 3 after Cameron decided not to work on the project.[73]  Nothing in the article

24  

25      [71]See *id.*; Stewart Terminator Decl., Exhs. 5, 7.

26      [72]Pl.'s Terminator Opp. at 10.

27      [73]See Stewart Terminator Decl., Exh. 5 (John Lippman, *The Producers: "The Terminator"*

28  *Is Back*, Wall Street Journal, March 8, 2002.)

1  suggests that Mechanic or Fox had any role in or invested money in Terminator 1 or 2. It

2  affirmatively demonstrates that Fox had no involvement in Terminator 3. Accordingly, this piece

3  of evidence raises no triable issues of fact regarding access or involvement by Fox in the creation

4  or production of the Terminator films.

5        Stewart next contends that the purported web page documents Twentieth Century Fox

6  Home Entertainment's distribution of Terminator 1 in Germany, and contradicts a claim made by

7  Fox's counsel that the studio's involvement with the film was limited to the distribution of home

8  videos in foreign territories.[74] What Fox's attorney may have represented in a letter is not

9  relevant in determining whether Stewart has raised a triable issue of fact defeating Fox's motion

10  for summary judgment. The pertinent inquiry is whether Stewart has adduced evidence that

11  contradicts Fox's showing in support of the motion. The purported web page does not. First,

12  the document is not properly authenticated, and cannot be considered in deciding the Terminator

13  Defendants' motion.[75] See FED.R.CIV.PROC. 56(e); see also *Orr v. Bank of America N.T. &*

14  *S.A.*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence

15

---

16      [74]*Id.*, Exh. 8.

17      [75]Neither the web address nor the origin of the web page is indicated. Rather, the text of

18  the purported web page is the body of an email sent to Stewart by someone whose email address

19  is "brownfhf@aol.com." Defendants object to paragraph 7 of Stewart's declaration (which
   incorporates Exhibit 7), *inter alia*, on the basis that it lacks foundation and states facts that are not

20  within Stewart's personal knowledge. Stewart does not state how she knows that the information
   reflected on Exhibit 7 comes from a web page, nor whether the web page is purportedly

21  maintained by Fox or some other entity. In fact, because a third party sent the email to Stewart,
   it appears that her knowledge regarding the text of the email is purely derivative. Because she

22  provides no information indicating that she has personal knowledge of the fact that the text of

23  Exhibit 7 can be found on a web page, Stewart cannot authenticate the document, and it cannot
   be considered in deciding the Terminator Defendants' motion for summary judgment. See

24  FED.R.CIV.PROC. 56(e); FED.R.EVID. 901. Certain unexplained aspects of the document,

25  moreover, underscore its uncertain origin. Stewart does not indicate how the parenthetical
   references to "votes" that follow several of the titles (including Terminator 1) relate to video

26  distribution in Germany. Additionally, the court notes that the entry for Terminator 1 appears
   in a different typeface than the remainder of the titles, suggesting that it may have been added.

27  For all of these reasons, the court sustains the Terminator Defendants' objection and declines to

28  consider Exhibit 7 and the references to it found in paragraph 7 of Stewart's declaration.

1  in ruling on a motion for summary judgment. . . .   Authentication is a 'condition precedent to

2  admissibility,' and this condition is satisfied by 'evidence sufficient to support a finding that the

3  matter in question is what its proponent claims.' . . .   We have repeatedly held that

4  unauthenticated documents cannot be considered in a motion for summary judgment").

5        Second, even if it were considered, the document does not raise a triable issue of fact

6  regarding Fox's involvement in the creation, writing, development and production of Terminator

7  1, 2, and 3.  As noted earlier, Fox has proffered evidence that it acquired limited distribution

8  rights to Terminator 1 and 2 domestically and in various foreign markets.[76]  To the extent Exhibit

9  7 is what Stewart contends it is, it is entirely consistent with, and does not contradict, Fox's

10  evidence regarding the distribution rights it acquired in the film after it was created and

11  produced.[77]  Although distribution of an infringing work is itself a form of infringement (see,

12  e.g., 17 U.S.C. § 106(3); *Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 62 (1st Cir. 2002) ("Section

13  106(3) [of the Copyright Act] explicitly grants to the copyright owner the exclusive right to

14  distribute copies of the copyrighted work. . . .  The Copyright Act further provides that 'anyone

15  who violates any of the exclusive rights of the copyright owner . . . is an infringer of the

16  copyright.' . . .  Thus, if Distribuidora distributed copies of Ortiz-Gonzalez's copyrighted work,

17  the act of distribution is a direct infringement itself, not an act of contributory or vicarious

18  infringement"); *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829,

19  843 (11th Cir. 1990) ("Public distribution of a copyrighted work is a right reserved to the

20  copyright owner, and usurpation of that right constitutes infringement"),[78] Stewart has failed to

21  ────────────────

22     [76]Meyerson Decl., ¶¶ 6-8.

23     [77]Twentieth Century Fox Home Entertainment distributes videocassettes for home use. See

24  Hoover's In-Depth Company Records, May 4, 2005, available on Westlaw at 2005 WLNR 6973447 ("Twentieth Century Fox Home Entertainment is the home video and DVD production

25  and distribution unit of Fox Filmed Entertainment's Twentieth Century Fox").

26     [78]Copyright infringement can be negligent as well as intentional.  See, e.g., *Ford Motor*

27  *Co. v. Summit Motor Productions*, 930 F.2d 277, 299 (3d Cir. 1991) (defendant's intentions are irrelevant because copyright infringement is strict liability tort); *CoStar Group, Inc. v. Loopnet,*

28  *Inc.*, 106 F. Supp. 2d 780, 787 (D. Md. 2000) ("De Andre's conduct in relation to the allegedly

1    raise a triable issue regarding the fact that Cameron and Hurd had access to her copyrighted works

2    at the time they created the Terminator films.  Accordingly, she has failed to raise a triable issue

3    of fact regarding Fox's liability for copyright infringement as a distributor of two of the films.

4         Stewart's final contention regarding access concerns statements purportedly made to her

5    in 2001 by FBI employees regarding their investigation of her criminal copyright claim.  Stewart

6    asserts that the FBI developed evidence that "established [her] as the writer of the movie 'The

7    Matrix' and 'The Terminator'" because "the FBI explained to [her] in 2001 that . . . the

8    Terminator series and the Matrix trilogies were from the same source work," and that "[a]ll of

9    the key characters in the Matrix movie ha[d] been identified from [Stewart's] work."[79]  Because

10   they are offered for the truth of the matter asserted, the statements the FBI purportedly made to

11   Stewart are hearsay, and inadmissible for the purpose of ruling on defendants' motions for

12   summary judgment.  See FED.R.EVID. 801(c); FED.R.CIV.PROC. 56(e).[80]  Other than these

13   hearsay statements in Stewart's declaration, the only evidence proffered regarding the FBI

14   investigation is an unauthenticated one-page FBI form that contains no reference to Stewart's

15   claim and that has a single handwritten comment – "Looks like a 295 E case."[81]  Although she

16   relies on this statement in opposing summary judgment on the issue of the Terminator Defendants'

17   access, Stewart has adduced no evidence as to what a "295 E case" is.[82]  Thus, even if she were

18   able to offer testimony in opposition to defendants' motions for summary judgment, Stewart's

19   statements regarding the FBI's investigation are inadmissible hearsay, and the FBI document she

20   proffers is unauthenticated and thus inadmissible.  The document, moreover, contains no

---

22   infringing activity can at most be characterized as negligent. . . . [T]he distinction between
     negligent and intentional infringement is irrelevant for purposes of liability"); *Educational Testing*
23   *Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999) (copyright infringement is a strict
     liability tort).

25   [79]Stewart Terminator Decl., ¶ 8.

26   [80]Defendants' objections to paragraph 8 on this basis are sustained.

27   [81]Stewart Terminator Decl., Exh. 11.

28   [82]See Pl.'s Terminator Opp. at 11.

1  information that relates obviously to access or to any other element of Stewart's copyright

2  infringement claim.

3      In sum, the Terminator Defendants have adduced uncontroverted evidence that the creators

4  of the Terminator films did not have access to Stewart's literary works.  Stewart has adduced no

5  admissible evidence controverting this showing, or supporting an inference that Hurd, Cameron

6  or any other person or entity involved in creating the Terminator films had access to her works.

7  Even if Stewart's testimony were admissible, no reasonable juror could conclude, based on the

8  evidence adduced, that the creators of the Terminator films had access to the Third Eye literary

9  works.  See *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984) ("[T]he jury cannot draw an

10  inference of access based upon speculation and conjecture alone").  Accordingly, the court finds

11  that, absent evidence raising a triable issue of fact regarding the striking similarity of Stewart's

12  protected works and Terminator 1, 2, and 3, the Terminator Defendants will be entitled to

13  summary judgment on Stewart's copyright claims.

14                           **b.  The Matrix Defendants**

15      Stewart bases her claim that the Matrix Defendants had access to her works on the

16  assertion that she mailed her treatment and manuscript to the Wachowskis in the summer of 1986

17  in response to an advertisement they allegedly placed in a national magazine.[83]  Citing Stewart's

18  admissions, the Matrix Defendants contend that no triable issue of fact remains respecting the

19  "access" prong of Stewart's claim.  The admissions establish that: (1) no one at Warner Bros. had

20  access to the six-page treatment or 47-page manuscript prior to the creation of Matrix 1;[84]

21  (2) Larry and Andy Wachowski did not place an advertisement soliciting works of science fiction

22  in a national magazine;[85] (3) Stewart never submitted the treatment or the 47-page manuscript to

23   

---

24      [83]See Complaint, ¶ 26; Plaintiff's Opposition To The Matrix Defendants' Motion For
25  Summary Judgment ("Pl.'s Matrix Opp.") at 8.

26      [84]*Id.* at 265.

27      [85]*Id.* at 285, 306.  Stewart, in fact, admitted that "there was *no* 'advertisement'" as that
term was defined in the requests for admission, i.e., the advertisement Stewart alleged that the
28  Wachowskis caused to be placed in a national magazine in the summer of 1986 soliciting works

1    Larry Wachowski, Andy Wachowski, Silver or Bloom;[86] (4) Larry Wachowski, Andy

2    Wachowski, Silver and Bloom did not have access to the six-page treatment or the 47-page

3    manuscript prior to the creation of Matrix 1, 2 or 3;[87] and (5) Larry and Andy Wachowski

4    independently created Matrix 1, 2, and 3.[88]  Stewart also admitted that no one connected with

5    Matrix 1, 2, or 3 had access to the treatment or the 47-page manuscript.[89]

6        In addition to relying on Stewart's admissions, the Matrix Defendants proffer evidence that

7    the individuals who created the Matrix films did not have access to Stewart's protected works.

8    Andy Wachowski has submitted a declaration stating that he never saw, read, received or had

9    access to Stewart's "Third Eye Literary Materials,"[90] that he has never met with or spoken to

10   Stewart, and that he had not heard of Stewart prior to the time she filed this action.[91]  Andy

11   Wachowski also states that he did not place an advertisement in a national magazine soliciting

12   works of science fiction in 1986 or at any other time.[92] In fact, he asserts, he was 18 years old

13   in 1986 and had just graduated from high school.[93]

14       Laurence ("Larry") Wachowski similarly asserts that he has not seen, read, received or

15

16

17

18   _____

     of science fiction.

19
         [86]*Id.* at 286, 307, 328, 345.
20
         [87]*Id.* at 286-87, 307-08, 329, 326.
21
22       [88]*Id.* at 288, 309.

23       [89]*Id.* at 287-88.

24       [90]Declaration of Andy Wachowski in Support of the Matrix Defendants' Motion for
25   Summary Judgment ("A. Wachowski Decl."), ¶¶ 3, 5-8.

26       [91]*Id.,* ¶ 4.

27       [92]*Id.,* ¶¶ 11-12.

28       [93]*Id.,* ¶ 3.

had access to Stewart's "Third Eye Literary Materials,"[94] that he has never met with or spoken to Stewart, and that he had not heard of Stewart prior to the commencement of this suit.[95] Like his brother, he states that he did not place an advertisement in a national magazine soliciting works of science fiction in 1986 or at any other time.[96]  In 1986, Larry Wachowski was 21 years old and attending Bard College in New York.[97]

Teresa Wayne, Warner Bros.' Vice President of Story and Creative Administration, has also submitted a declaration.  Wayne has worked for Warner Bros. for 24 years, and has been in charge of the Story Department since 1993.[98]  She states that Warner Bros. accepts scripts, treatments or other literary material only from licensed literary agents, or from producers, attorneys or managers with whom it has a business relationship.[99]  When a creative executive receives literary material, he or she submits it to the Story Department.  The Story Department maintains a computerized database into which it enters every script, treatment or other literary material it receives.  The database is checked and updated daily.[100]  Wayne checked the database to determine the date Stewart's work, "Third Eye," was received by Warner Bros.  The database reflects that Stewart's literary work was first received on April 16, 1999, when she sent it to

---

[94]Declaration Of Laurence Wachowski In Support Of The Matrix Defendants' Motion For Summary Judgment ("L. Wachowski Decl."), ¶¶ 3, 5-8.

[95]*Id.*, ¶ 4.  The Wachowskis define the "Third Eye Literary Materials" that they reference in their declarations as "(1) a six-page treatment [ ]titled the 'Third Eye,'; (2) a forty-five page manuscript [ ]titled the 'Third Eye;' and (3) an additional document which Stewart calls the 'Making of the Third Eye.'"  As discussed in note 55, *supra*, the Wachowskis, like Cameron and Hurd, thus assert that they have never seen, read, received or had access to the six-page treatment, the 45-page instrument, or the single page "Making of The Third Eye."

[96]*Id.*, ¶¶ 11-12.

[97]*Id.*, ¶ 3.

[98]Declaration Of Teresa Wayne In Support Of The Matrix Defendants' Motion For Summary Judgment ("Wayne Decl."), ¶ 1.

[99]*Id.*, ¶ 3.

[100]*Id.*, ¶ 4.

26

1   Warner Bros.' legal department with a claim letter.[101]

2          The database shows that Joel Silver first submitted The Matrix to Warner Bros. on

3   February 4, 1994.[102]  The film was released domestically on March 31, 1999, prior to the date

4   Warner Bros. received Stewart's literary materials.[103]

5          These declarations, together with Stewart's admissions, show that the creators of Matrix

6   1, 2, and 3 did not have access to any of Stewart's protected works and created the films

7   independently.  Stewart bears the burden of proof on this issue, of course, and must therefore

8   adduce contradictory evidence that raises a triable issue of fact regarding access to defeat

9   summary judgment.  The only evidence Stewart proffers regarding access is her own declaration

10  and certain documents attached thereto.  In a separate order, the court has precluded Stewart from

11  offering testimony in opposition to defendants' motions for summary judgment.  Thus, none of

12  the evidence she submits may be considered, and no triable issue of fact defeating summary

13  judgment has been raised.

14         Even if Stewart's declaration and exhibits were to be considered, moreover, the court

15  would conclude that she had failed to raise a triable issue of fact regarding access.  Stewart asserts

16  that she mailed the six-page treatment, the 45-page instrument and the 47-page manuscript to the

17  Wachowskis in 1986 in response to an advertisement in a national magazine.[104]  This testimony

18  is inadmissible, however, because Stewart cannot proffer evidence that directly contradicts her

19  admission that the magazine advertisement never existed. See FED.R.CIV.PROC. 36(b); *American*

20

21

22

23         [101]*Id.*, ¶ 9.

24
            [102]*Id.*, ¶ 7.
25

26         [103]*Id.*, ¶ 8.

27         [104]Pl.'s Matrix Opp. at 8; Declaration of Sophia Stewart In Support Of Plaintiff's
    Opposition To The Matrix Defendants' Summary Judgment Motion ("Stewart Matrix Decl."),
28  ¶ 6.

1    *Auto Ass'n.*, *supra*, 930 F.2d at 1120.[105]

2          Plaintiff next argues that Warner Bros.' unauthorized access to her work can be inferred

3    from a letter that Jeremy N. Williams, Deputy Chief Counsel for Warner Bros., sent to her in

4    1999.  This letter responded to an infringement claim that Stewart had asserted.  It analyzed the

5    purported similarities between Stewart's work and Matrix 1, and concluded that Stewart's claim

6    lacked merit.[106]  Stewart asserts that the only document she sent Warner Bros. was the 47-page

7

8    _____

9    [105]The Matrix Defendants contend that plaintiff's statement that she "responded to an
     advertisement requesting science fiction manuscripts to make into a comic book," and "sent to
10   Larry Wachowski and Andy Wachowski [her] protected literary work," (Sewart's Matrix Decl.,
     ¶ 6.) is also inadmissible based on the best evidence rule.  "The best evidence rule provides that
11   the original of a 'writing, recording, or photograph' is required to prove the contents thereof."
12   *United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004) (citing FED.R.EVID. 1002).
     However, plaintiff's statement is not directed at proving the contents of a writing.  Although
13   plaintiff offers a general description of a writing – the purported advertisement – she offers it for
     the purpose of showing how she came to mail her literary works to the Wachowskis. See *Jackson*
14   *v. Crews*, 873 F.2d 1105, 1110 (8th Cir. 1989) (finding no violation of the best evidence rule
15   where plaintiff asked his witnesses to describe the contents of a flyer for the purpose of
     "show[ing] how the witness learned of the case and came to testify").
16         Defendants also contend that Stewart's statement that she mailed the six-page treatment,
17   the 45-page instrument and the 47-page manuscript is an attempt to prove the contents of the
     mailing.  "The best evidence rule provides that the original of a 'writing, recording, or
18   photograph' is required to prove the contents thereof."  *United States v. Bennett*, 363 F.3d 947,
19   953 (9th Cir. 2004) (citing FED.R.EVID. 1002).  Here, the issue is whether Stewart mailed certain
     documents to the Wachowskis in or about 1986, not the contents of those documents or any cover
20   letter that accompanied them.  See *id.* ("The rule's application turns on 'whether contents are
     sought to be proved,'" quoting FED.R.EVID. 1002, Advisory Committee Note).  It is true that
21   Stewart has not produced a copy of her 1986 mailing, or any proof that the mailing took place,
22   and that this appears inconsistent with the fact that she has such documentation for other
     submissions of literary material during the same time period.  See Declaration Of Bruce Isaacs
23   In Support Of The Matrix Defendants' Motion For Summary Judgment ("Isaacs Decl."), ¶ 8,
24   Exh. 12 at 148-49 (revealing that Stewart retained proofs of mailing for submissions of literary
     materials to Fox in 1984 and 1985, and that she also retained a proof of mailing and a receipt
25   dated January 29, 1987 for a payment made to the Writer's Guild of America).  This goes to the
     weight of the evidence, however, not to its admissibility.  On summary judgment, of course, the
26   court does not weigh evidence, but merely determines whether triable issues of fact remain that
27   must be decided at trial.

28         [106]Pl.'s Matrix Opp. at 10-11.

1  manuscript titled "Third Eye."[107]  Williams letter rejecting Stewart's claim, however, refers to

2  the work as "The Third Eye."[108]  Stewart contends that Williams' addition of "the" to the title of

3  her work reveals that he was not analyzing the work she forwarded to Warner Bros., but rather

4  the 45-page instrument she mailed to the Wachowskis in 1986.[109]  Stewart contends she has raised

5  a triable issue of fact concerning access because "[t]he only way that Mr. Williams could have

6  analyzed *The* Third Eye" was if he already had the manuscript."[110]

7        Because it rests on the premise that she sent her literary materials to the Wachowskis in

8  response to a national magazine advertisement they placed in 1986, this argument impermissibly

9  contradicts Stewart's admission that the Wachowskis did not place an advertisement soliciting

10  works of science fiction in a national magazine.[111]  Moreover, no reasonable trier of fact could

11  find that Williams' use of "The Third Eye" rather than "Third Eye" establishes that Warner Bros.

12  had unauthorized access to a prior draft of Stewart's manuscript.  Despite the fact that they bear

13  the title "Third Eye," Stewart's own complaint repeatedly refers to the treatment and the 47-page

14  manuscript as "The Third Eye."  It appears, therefore, that Williams' error was unremarkable,

15  and does not raise a genuine issue of fact defeating summary judgment.  See *Anderson*, *supra*,

16  477 U.S. at 249-50 ("there is no issue for trial unless there is sufficient evidence favoring the

17  nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely

18  colorable, . . . or is not significantly probative, . . . summary judgment may be granted"); *id.*

---

[107]*Id.* at 11; Stewart Matrix Decl., ¶ 8.

[108]*Id.*; see Declaration of John Schulman in Support of the Matrix Defendants' Motion for Summary Judgment ("Schulman Decl."), Exh. 8.

[109]Pl.'s Matrix Opp. at 11; Stewart Matrix Decl., ¶ 9.  Although the Matrix Defendants object to paragraph 9 of Stewart's declaration on the grounds that it lacks foundation and is speculative and conclusory, Stewart has personal knowledge of the document she submitted to Warner Bros. and of the contents of the letter she received from Williams in 1999.  Had the court not precluded Stewart's testimony, therefore, it would overrule these objections.

[110] *Id.* (emphasis added).

[111]*Id.* at 285, 306.

1   at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be

2   insufficient;  there must be evidence on which the jury could reasonably find for the plaintiff.

3   The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a

4   preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is

5   [evidence] upon which a jury can properly proceed to find a verdict for the party producing it,

6   upon whom the onus of proof is imposed'"); *Matsushita Electric Industrial Co., Ltd. v. Zenith*

7   *Radio Corp.*, 475 U.S. 574, 587 (1986) ("[T]he issue of fact must be 'genuine.' . . . When the

8   moving party has carried its burden under Rule 56(c), its opponent must do more than simply

9   show that there is some metaphysical doubt as to the material facts. . . . In the language of the

10  Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine

11  issue for trial.' . . . Where the record taken as a whole could not lead a rational trier of fact to

12  find for the non-moving party, there is no 'genuine issue for trial'"); *City of Vernon v. Southern*

13  *California Edison Co.*, 955 F.2d 1361, 1369 (9th Cir. 1992) (stating that "[i]t is not enough for

14  a party [opposing summary judgment] to content itself once it has produced a mere scintilla of

15  evidence to support its case").

16      Stewart seeks further support for her contention that Warner Bros. gained unauthorized

17  access to her work in a conversation she purportedly had with Julie Nulack, a Warner Bros.

18  attorney.  Stewart contends that Nulack admitted that Warner Bros. knew about the "original

19  manuscript" titled "The Third Eye," and knew that it did not belong to the Wachowskis.  She

20  asserts that Nulack told her not to settle her claim because Nulack and others had seen the original

21  manuscript being copied.[112]  Stewart's repetition of Nulack's purported statement is hearsay unless

22  it is properly admitted as a party admission.[113]  See FED.R.EVID. 801(d)(2)(D) ("A statement is

---

[112]Stewart Matrix Decl., ¶ 11.

[113]Defendants contend Nulack's purported statement is irrelevant, and inadmissible because
it occurred during the course of a settlement negotiation.  Nulack's statement is relevant in that
it has some tendency in reason to make Stewart's theory of access more probable.  See
FED.R.EVID. 401.  Given Stewart's assertion that Nulack's statements were made "after [she]
made her claim to Warner Bros." and "[d]uring a settlement meeting," however, it appears that
Nulack's remarks may be inadmissible under Rule 408.  See FED.R.EVID. 408 ("Evidence of

30

1    not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's

2    agent or servant concerning a matter within the scope of the agency or employment, made during

3    the existence of the relationship").  To demonstrate that the statement is admissible under Rule

4    801(d)(2)(D), Stewart must establish, by substantial evidence, (1) that an agency relationship

5    between Fox and Nulack existed; (2) that Nulack's statements were made during the course of that

6    relationship; and (3) that the statements concerned matters within the scope of Nulack's agency.

7    See, e.g., *Hilao v. Estate of Marcos*, 103 F.3d 767, 775 (9th Cir. 1996) ("The existence of an

8    agency relationship is a question for the judge under Rule 104(a) and must be proved by

9    substantial evidence but not by a preponderance of the evidence"); see also *Gomez v. Rivera

10   Rodriguez*, 344 F.3d 103, 116 (1st Cir. 2003); *Pappas v. Middle Earth Condominium Ass'n.*, 963

11   F.2d 534, 537 (2d Cir. 1992).  Here, accepting Stewart's statement that Nulack was a Warner

12   Bros. attorney, she has proffered no evidence that Nulack had authority to make statements

13   concerning Stewart's claim.  She has not detailed Nulack's position within Warner Bros.' legal

14   department.  Nor has she explained the nature of Nulack's participation, if any, in evaluating the

15   claim or determining Warner Bros.' position with respect to it.  Accordingly, the court cannot

16   find that Nulack's alleged statement concerned a matter within the scope of her agency for Warner

17   Bros. See *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir. 1986) ("Rule 801(d)(2)(D)

18   requires the proffering party to lay a foundation to show that an otherwise excludible statement

19   relates to a matter within the scope of the agent's employment"); see also *United States v. Chang*,

20   207 F.3d 1169, 1176 (9th Cir.) (the party proffering evidence pursuant to Rule 801(d)(2)(D) bears

21   the burden of establishing an adequate foundation), cert. denied, 531 U.S. 860 (2000); *Harris v.

22   Itzhaki*, 183 F.3d 1043, 1054 (9th Cir. 1999) (citing *Breneman*).  As a consequence, the Matrix

23

24   conduct or statements made in compromise negotiations is likewise not admissible"); see also

25   *Affiliated Manufacturers, Inc. v. Aluminum Co. of America*, 56 F.3d 521, 526-28 (3d Cir. 1995)
     (stating that "Rule 408 has been interpreted as applicable to an actual dispute, or at least an

26   apparent difference of view between the parties concerning the validity or amount of a claim,"
     and that "the meaning of 'dispute' as employed in the rule includes both litigation and less formal

27   stages of a dispute").  Since the court excludes the testimony on other grounds, however, it need

28   not finally decide this issue.

1   Defendants' hearsay objection to it must be sustained.

2        Finally, Stewart contends that she has raised a triable issue of fact regarding the Matrix

3   Defendants' access because FBI agents purportedly told her in 2001 that their investigation of her

4   criminal copyright claim had "established [her] as the writer of the movie 'The Matrix' and 'The

5   Terminator.'"[114] As she does in her opposition to the Terminator Defendants' motion for summary

6   judgment, Stewart again attempts to rely on an unauthenticated one-page FBI form, which does

7   not indicate that it concerns Stewart's claim, and which contains a single handwritten comment:

8   "Looks Like a 295 E case."[115]  Stewart also asserts that FBI Special Agent John Barros told her

9   Matrix 1 was edited to remove an introduction allegedly copied from her work.[116]  Stewart's

10  hearsay statements concerning remarks purportedly made by FBI agents are not admissible.

11  FED.R.CIV.PROC. 56(e).  The FBI document is likewise inadmissible, as it is unauthenticated.

12  See *id.*; *Orr*, *supra*, 285 F.3d at 773 ("We have repeatedly held that unauthenticated documents

13  cannot be considered in a motion for summary judgment").   Even if it were considered,

14  moreover, the document contains no information regarding the Matrix Defendants' access to

15  Stewart's literary works or to any other element of her copyright infringement claim.

16       In sum, the Matrix Defendants have adduced uncontroverted evidence that the creators of

17  the Matrix movies did not have access to Stewart's protected literary works.  Stewart has adduced

18  no admissible evidence controverting this showing, or supporting an inference that the

19  Wachowskis, Silver, Warner Bros., or any other person or entity involved in creating the Matrix

20  films had access to her works.  Accordingly, the court finds that, absent evidence raising a triable

21  issue of fact regarding the striking similarity of Stewart's protected works and Matrix 1, 2, and

22  3, the Matrix Defendants will be entitled to summary judgment on Stewart's copyright claims.[117]

23  _____

24       [114]Stewart Matrix Decl., ¶ 11.

25       [115]Stewart Matrix Decl., Exh. 11.

26       [116]Stewart Matrix Decl., ¶ 11.

27       [117]In her opposition, Stewart seeks a continuance pursuant to Rule 56(f) for the purpose of
28  deposing Williams, Nulack and defendants.  (See Pl.'s Matrix Opp. at 22; Declaration Of Michael

## 2.     Proving Access Through "Striking Similarity"

Although the Ninth Circuit has not squarely addressed the question, a majority of courts that recognize the "striking similarity" doctrine hold that it is a means of proving access, not that it obviates the need to prove access.[118]  See, e.g., *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d

---

T. Stoller In Support Of Plaintiff's Opposition To Defendants' Motion For Summary Judgment ("Stoller Decl."), ¶ 3.)  "To prevail under . . . Rule [56(f)], parties opposing a motion for summary judgment must make (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists.  The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment.  The district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past, or if the movant fails to show how the information sought would preclude summary judgment."  *Employer Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129-30 (9th Cir. 2004) (internal quotation marks and citations omitted).  Because the court has found on multiple occasions that Stewart has not prosecuted this action and pursued discovery diligently, her Rule 56(f) motion must be denied.  (See Order Denying Plaintiff's *Ex Parte* Application for Continuance of Case Management Dates at 5; see also Order Denying Plaintiff's Motion for Relief Pursuant to Rule 60(b).)  Moreover, Stewart has failed to show that the information sought would preclude summary judgment.  The court has found that a reasonable trier of fact could not find, based on Williams' use of the title, "The Third Eye," that he had unauthorized access to a early draft of Stewart's manuscript.  Because Stewart's testimony has been excluded, moreover, she has presented no admissible evidence concerning Nulack's involvement in the case.  Similarly, because Stewart's admissions conclusively establish lack of access, Stewart could not proffer contradictory information obtained from Williams, Nulack or the Wachowskis.  Given Stewart's lack of diligence in pursuing discovery and her failure to show how the information sought would preclude summary judgment, the court denies her request for a Rule 56(f) continuance.

[118]The Ninth Circuit's decisions can be read as contradictory on this point.  Some cases employ broad language that could be interpreted to mean that it is proper to find access solely on the basis of striking similarity.  See, e.g., *Seals-McClellan v. Dreamworks, Inc.*, 120 Fed. Appx. 3, 2004 WL 2823320, * 1 (9th Cir. Dec. 9, 2004) (Unpub. Disp.) ("Where a plaintiff cannot show a reasonable opportunity for access, proof that the protected and accused works are 'strikingly similar' gives rise to an inference of copying"); *Winn v. Opryland Music Group, Inc.*, 22 Fed. Appx. 728, 2001 WL 1346014, * 1 (9th Cir. Nov. 1, 2001) (Unpub. Disp.) ("The court did not even need to consider the access question because of the 'striking similarity' between the song claimed by Appellants and that claimed by Appellees"); *Nintendo of America, Inc. v. Brown*, 94 F.3d 652, 1996 WL 468590, * 1 (9th Cir. Aug. 12, 1996) (Unpub. Disp.) ("[B]ecause there is a 'striking similarity' between the games Brown sold and Nintendo's games, an inference of copyright infringement arises"); *Baxter, supra*, 812 F.2d at 423 ("Absent evidence of access, a

33

350, 356 (4th Cir. 2001) ("Unlike the Fifth Circuit, this court does not favor the wholesale abandonment of the access requirement in the face of a striking similarity. Rather, like the Second and Seventh Circuits, this court recognizes that striking similarity is one way to demonstrate access. Access remains an indispensable part of a copyright infringement claim"); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1170 (7th Cir. 1997) ("a similarity that is so close as to be highly unlikely to have been an accident of independent creation is evidence of access"); *Gaste, supra*, 863 F.2d at 1067-68 (holding that striking similarity between works permits an inference of access because it establishes a high probability of copying and negates any reasonable possibility of independent creation) but see *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 113 (5th Cir. 1978) (where there is a striking similarity between works that precludes the possibility of independent creation, "'copying' may be proved without a showing of access").

Courts adopting the majority rule generally require that an inference of copying drawn from striking similarity between works "be reasonable in light of all the evidence. A plaintiff has not proved striking similarity sufficient to sustain a finding of copying if the evidence as a whole does not preclude any reasonable possibility of independent creation." *Gaste, supra*, 863 F.2d at 1068; see also *Bouchat, supra*, 241 F.3d at 356 ("Any finding of access must be reasonable in light of all of the facts of a particular case"). In *Selle, supra*, 741 F.2d at 901, the Seventh Circuit described the requirement as follows:

---

'striking similarity' between the works may give rise to a permissible inference of copying," citing *Selle, supra*, 741 F.2d 896). At other times, the Ninth Circuit has appeared to indicate that striking similarity alone is not sufficient to establish access. See *Fodor v. Time Warner, Inc.*, 19 F.3d 27, 1994 WL 65287, * 2 (9th Cir. Mar. 2, 1994) (Unpub. Disp.) ("However, if Warner did not have access to the screenplay prior to the writing of *Target Stealth*, even striking similarities between the two works must be deemed fortuitous," citing *Feist Publications, supra*, 499 U.S. 340); see also *Berkla v. Corel Corp.*, 66 F. Supp. 2d 1129, 1144 (E.D. Cal. 1999) ("[T]he Ninth Circuit permits access to be shown by circumstantial evidence. A striking similarity between the infringed and infringing work may be sufficient to demonstrate access"). Many of the cases that contain broad language regarding striking similarity, moreover, rely on *Baxter*. In *Baxter*, the parties stipulated that defendant had had access to plaintiff's work. *Baxter, supra*, 812 F.2d at 424.

1  ". . . no matter how great the similarity between the two works, it is not their

2  similarity *per se* which establishes access; rather, their similarity tends to prove

3  access in light of the nature of the works, the particular . . . genre involved and

4  other circumstantial evidence of access.  In other words, striking similarity is just

5  one piece of circumstantial evidence tending to show access and must not be

6  considered in isolation; it must be considered together with other types of

7  circumstantial evidence relating to access.  As a threshold matter, therefore, it

8  would appear that there must be at least some other evidence which would establish

9  a reasonable possibility that the complaining work was available to the alleged

10  infringer.  As noted, two works may be identical in every detail, but, if the alleged

11  infringer created the accused work independently or both works were copied from

12  a common source in the public domain, then there is no infringement.  Therefore,

13  if the plaintiff admits to having kept his or her creation under lock and key, it

14  would seem logically impossible to infer access through striking similarity.  Thus,

15  although it has frequently been written that striking similarity alone can establish

16  access, the decided cases suggest that this circumstance would be most unusual.

17  The plaintiff must always present sufficient evidence to support a reasonable

18  possibility of access because the jury cannot draw an inference of access based upon

19  speculation and conjecture alone. . . .  Thus, although proof of striking similarity

20  may permit an inference of access, the plaintiff must still meet some minimum

21  threshold of proof which demonstrates that the inference of access is reasonable."

22  *Selle* has been criticized for requiring proof of a "reasonable possibility" of access rather than a

23  "bare possibility" of access.  3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT,

24  § 13.02[B] (2002) (criticizing the *Selle* requirement that there be a "reasonable possibility" of

25  access – not just a "bare possibility" – even in cases of truly striking similarity); see also *Gaste*,

26  *supra*, 863 F.2d at 1068 ("In this Circuit, the test for proof of access in cases of striking similarity

27  is less rigorous"); cf. *Ty*, *supra*, 132 F.3d at 1170 ("But unlike . . . the authors of . . . Nimmer

28  on Copyright . . . , we do not read our decision in *Selle* to hold or imply, in conflict with the

35

1   *Gaste* decision, that no matter how closely the works resemble each other, the plaintiff must

2   produce some (other) evidence of access").

3         Given the Ninth Circuit's statement of the striking similarity test in *Baxter*, and its citation

4   to *Selle*, the court concludes that the Ninth Circuit follows the majority rule that striking similarity

5   will support an inference of access only when such an inference is reasonable in light of the

6   totality of the evidence in the record. It further concludes that the Ninth Circuit would not require

7   evidence of a "reasonable possibility" of access in cases of striking similarity, but would hold,

8   like the Second Circuit, that evidence of a work's availability, together with evidence of striking

9   similarity, supports a finding that defendant impermissibly copied plaintiff's works.[119] Cf. *Three*

10  *Boys Music, supra,* 212 F.3d at 485 ("Under our case law, substantial similarity is inextricably

11  linked to the issue of access. In what is known as the 'inverse ratio rule,' we 'require a lower

12  standard of proof of substantial similarity when a high degree of access is shown.' Furthermore,

13  in the absence of any proof of access, a copyright plaintiff can still make out a case of

14  infringement by showing that the songs were 'strikingly similar'"); *Sid & Marty Krofft, supra,*

15  562 F.2d at 1172 (" . . . where clear and convincing evidence of access is presented, the quantum

16  of proof required to show substantial similarity may . . . be lower than when access is shown

17  merely by a preponderance of the evidence").

18        The key question is whether the record reflects the bare possibility of access, and whether,

19  given that possibility, the only conclusion that can be drawn from the striking similarity of the

20  works is that one derived from the other. See 4 Melville B. Nimmer & David Nimmer, NIMMER

21  ON COPYRIGHT, § 13.02[B] (2005) ("At base, 'striking similarity' simply means that, in human

22  experience, it is virtually impossible that the two works could have been independently

23  created");[120] see also Aaron M. Broaddus, *Eliminating the Confusion: a Restatement of the Test*

24

---

25  [119]This test is different from that which relies on a combination of access and substantial
26  similarity. In this context, a "reasonable possibility" of access is required; a "bare possibility"
    will not suffice. See *Three Boys Music, supra,* 212 F.3d at 482.

27  [120]Nimmer notes that proof of a "bare possibility" of access is essential. See 4 Melville
28  B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13.02[B], n. 70.2 ("It would seem that

1    *for Copyright Infringement*, 5 DEPAUL-LCA J. ART & ENT. LAW 43 (1995) ("It is important to

2    note here that a finding that the defendant's work is strikingly similar to plaintiff's does not

3    eliminate the requirement of access as a condition to proving infringement.  Instead, striking

4    similarity gives rise to an inference of access by negating the possibility that the work could have

5    been derived from independent creation, common source or some other work besides the

6    plaintiff's.  This distinction is important to keep in mind because, although a showing of striking

7    similarity allows the court to infer access, most courts will still require that there be at least a bare

8    possibility that defendant had access to plaintiff's work").

9                    a.      **Whether Plaintiff Can Show A "Bare Possibility" That The**

10                           **Terminator Defendants Had Access To Her Works**

11            Applying the standard articulated above, Stewart cannot sustain her burden of proof unless

12    she can show at least a "bare possibility" of access.  As discussed earlier, Stewart has proffered

13    no admissible evidence from which a reasonable trier of fact could find that her works were

14    available to any person involved in the creation, writing development, or production of the

15    Terminator films.  Defendants have presented uncontroverted evidence that the individuals

16    involved in creating the Terminator films did not have any access to Stewart's literary works, and

17    that the Terminator films were the product of independent creation.  As a result, even evidence

18    of striking similarity between the Terminator films and Stewart's works will not raise a triable

19    issue of fact as to whether the Terminator Defendants had access to the works.  This is because

20    "the evidence as a whole does not preclude any reasonable possibility of independent creation."

21    See *Gaste*, *supra*, 863 F.2d at 1068 ("Though striking similarity alone can raise an inference of

22    copying, that inference must be reasonable in light of all the evidence.  A plaintiff has not proved

23    striking similarity sufficient to sustain a finding of copying if the evidence as a whole does not

24    _____

25    a bare possibility of access must always be present in order for plaintiff to go forward.  For
      example, even if defendant's 1000-page novel matches plaintiff's word-for-word, to the extent
26    that the evidence shows that plaintiff had locked her novel in a safe from the instant of
      composition forward, then that bare possibility is absent.  In that event, it might be just as
27    reasonable to imagine that plaintiff copied from defendant, or both derived from a prior work,
      as to imagine that defendant copied from plaintiff").
28

1    preclude any reasonable possibility of independent creation"); see also *Bouchat*, *supra*, 241 F.3d

2    at 356 (adopting the *Gaste* test); *Selle*, *supra*, 741 F.2d at 901 (". . . no matter how great the

3    similarity between the two works, it is not their similarity *per se* which establishes access");

4    *Zimmerman v. Tennille*, No. 83 CIV. 8606 (CSH), 1988 WL 42022, * 3 (S.D.N.Y. Apr. 21,

5    1988) (noting *Selle*'s statement that there must be some evidence establishing a possibility that

6    plaintiff's work "was *available*" to defendant, the court held that evidence that the parties' works

7    are strikingly similar "does not preserve a plaintiff's claim when the evidence affirmatively

8    negates access," and that summary judgment was appropriate because "plaintiff at bar [had] failed

9    to offer any plausible proof of access, [and] his theory [of access was] geographically and

10   chronologically implausible"); compare *Onofrio*, *supra*, 2000 WL 206576 at * 1 (applying the

11   striking similarity test after determining that plaintiff had adduced proof demonstrating a bare

12   possibility of access); *Dan River, Inc. v. Sanders Sale Enterprises, Inc.*, 97 F. Supp. 2d 426, 430

13   (S.D.N.Y. 2000) (applying the striking similarity test where there was insufficient evidence in

14   the record to demonstrate access, but undisputed evidence "that [plaintiff's] designs were readily

15   available in retail markets throughout the United States"). Because Stewart has failed to adduce

16   any evidence showing even a bare possibility of access to her works by the Terminator

17   Defendants, it appears they are entitled to summary judgment on Stewart's claims on this basis

18   alone. Given the uncertainty of Ninth Circuit law on this issue, however, the court will examine

19   whether Stewart has raised a triable issue of fact regarding the striking similarity of the parties'

20   works.

21              **b.      Whether Plaintiff Can Show A "Bare Possibility" That The**

22                       **Matrix Defendants Had Access To Her Works**

23       Stewart has likewise adduced no admissible evidence from which a reasonable trier of fact

24   could conclude that her works were available to any person or entity involved in the creation,

25   writing or production of the Matrix films. Defendants have proffered admissions by Stewart as

26   well as uncontroverted evidence that the individuals involved in creating the Matrix films did not

27   have access to Stewart's literary works. Stewart has admitted, moreover, that the Matrix films

28   were the product of independent creation. Because Stewart has failed to adduce admissible

1 evidence showing even a bare possibility of access to her works by the Matrix Defendants, even

2 evidence of striking similarity between the Matrix films and Stewart's works will not raise a

3 triable issue of fact as to whether the Matrix Defendants had access to her works, and the Matrix

4 Defendants are entitled to summary judgment on this basis alone.  As noted, however, the court

5 will examine whether Stewart has raised a triable issue of fact regarding the striking similarity of

6 the parties' works.

7         **c.    Evidence Of "Striking Similarity"**

8        In the Ninth Circuit, "summary judgment is not highly favored on questions of . . .

9 similarity in copyright cases."  *Shaw, supra,* 919 F.2d at 1355.  Summary judgment is

10 appropriate only if "no reasonable juror could find [striking] similarity of ideas and expression,

11 viewing the evidence in the light most favorable to the nonmoving party."  *Kouf, supra,* 16 F.3d

12 at 1045.  "Where reasonable minds could differ on the issue of [striking] similarity, summary

13 judgment is improper."  *Smith, supra,* 84 F.3d at 1217.  See also *Cavalier v. Random House,*

14 *Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) ("'Although summary judgment is not highly favored on

15 questions of substantial similarity in copyright cases, summary judgment is appropriate if the court

16 can conclude, after viewing the evidence and drawing inferences in a manner most favorable to

17 the non-moving party, that no reasonable juror could find substantial similarity of ideas and

18 expression. . . .  Where reasonable minds could differ on the issue of substantial similarity,

19 however, summary judgment is improper,'" quoting *Shaw*); *Pasillas v. McDonald's Corp.*, 927

20 F.2d 440, 442 (9th Cir. 1991) ("Our circuit has expressed a certain disfavor for summary

21 judgment on questions of substantial similarity, but it is nevertheless appropriate to grant summary

22 judgment if, considering the evidence and drawing all inferences from it in the light most

23 favorable to the nonmoving party, no reasonable jury could find that the works are substantially

24 similar in idea and expression").

25        Similarity means a "similarity of expression, not merely similarity of ideas or concepts."

26 *Chase-Riboud v. Dreamworks, Inc.*, 987 F. Supp. 1222, 1225 (C.D. Cal. 1997).  "Striking

27 similarity" exists when two designs "are so much alike that  the only reasonable explanation for

28 such a great degree of similarity is that the later [work] was copied from the first."  *Gaste, supra,*

863 F.2d at 1067, n. 3; see also *Blue Fish Clothing, Inc. v. Kat Prints*, CIV. A. No. 91-1511, 1991 WL 71113, * 7 (E.D. Pa. Apr. 29, 1991) ("'[S]triking similarity simply means that in human experience it is virtually impossible that the two works could have been independently created,'" quoting 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13.02[B], n. 20 (1985)); *Kent v. Revere*, No. 84-798-CIV-ORL-18, 1985 WL 6453, * 7 (M.D. Fla. Oct. 28, 1985) (same).

Striking similarity is judged not just with reference to the fact that both works contain identical elements, but also by considering the uniqueness and complexity of the common features. See *Selle*, *supra*, 714 F.2d at 903-04 ("'Striking similarity' is not merely a function of the number of identical notes that appear in both compositions. . . . An important factor in analyzing the degree of similarity of two compositions is the uniqueness of the sections which are asserted to be similar. If the complaining work contains an unexpected departure from the normal metric structure or if the complaining work includes what appears to be an error and the accused work repeats the unexpected element or the error, then it is more likely that there is some connection between the pieces. . . . If the similar sections are particularly intricate, then again it would seem more likely that the compositions are related. Finally, some dissimilarities may be particularly suspicious"). Thus, "to prove that certain similarities are 'striking,' plaintiff must show that they are the sort of similarities that cannot satisfactorily be accounted for by a theory of coincidence, independent creation, prior common source, or any theory other than that of copying. The similarities should be sufficiently unique or complex "as to make it unlikely that both pieces were copied from a prior common source, . . . or that the defendant was able to compose the accused work as a matter of independent creation." *Id*. at 904.[121]

Here, the court need not – indeed cannot – engage in a side-by-side comparison of the

---

[121]The *Selle* court observed that "striking similarity is an extremely technical issue – one with which, understandably, experts are best equipped to deal." *Id*. at 904. Other courts have eschewed the need for expert testimony. Nimmer opines that "while expert testimony may be necessary to establish striking similarity in 'technical' areas, such as music, in many cases, the trier of fact is equipped to make this determination without expert assistance." 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13.02[B] (2005) (footnote omitted).

protected and accused works, since neither party has proffered the accused films as part of the record on the pending summary judgment motions. Because Stewart bears the burden of proof on striking similarity, her failure to submit the Terminator and Matrix films in opposition to the motions necessitates the entry of summary judgment against her. See *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986) (affirming summary judgment where plaintiff failed to produce originals of his protected works because "[t]he contents of Seiler's work are at issue. There can be no proof of 'substantial similarity' and thus of copyright infringement unless Seiler's works are juxtaposed with Lucas' and their contents compared. Since the contents are material and must be proved, Seiler must either produce the original or show that it is unavailable through no fault of his own. Rule 1004(1). This he could not do"). As the *Seiler* court noted, proof of substantial or striking similarity depends upon a comparison of the protected works and the accused works. The court must employ a two-part test to determine similarity. The "extrinsic test" is an objective comparison of specific expressive elements such as plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Cavalier, supra*, 297 F.3d at 822; *Kouf, supra*, 16 F.3d at 1045. The "intrinsic test" is a subjective comparison that focuses on whether an "ordinary, reasonable audience" would find the works substantially similar in "total concept and feel." *Cavalier, supra*, 297 F.3d at 822 (quoting *Kouf, supra*, 16 F.3d at 1045). Without defendants' works before it, the court cannot determine if application of either test raises factual issues that must be decided by a jury.

On this basis alone, therefore, the court must enter summary judgment in favor of both the Terminator and the Matrix Defendants. As detailed below, moreover, Stewart's admissions concerning the lack of similarity between her works and the Terminator and Matrix films establish the absence of a triable issue of fact regarding striking similarity.

i. **Whether Plaintiff Can Establish That Her Works Are Strikingly Similar To Terminator 1, 2, And 3**

Stewart has admitted that Terminator 1 is neither strikingly nor substantially similar to

1  "The Third Eye";[122] that Terminator 2 is neither strikingly nor substantially similar to "The Third

2  Eye";[123] and that Terminator 3 is neither strikingly nor substantially similar to "The Third

3  Eye."[124]  Stewart has also admitted that the protectable expression in "The Third Eye" is not

4  substantially similar to the protectable expression in any of Terminator 1, 2, and 3.[125]  Although

5  these admissions concern only the six-page treatment and 47-page edited manuscript referenced

6  in and attached to the complaint, the court's review of the 29-page manuscript that forms the core

7  of the 45-page instrument reveals that it is virtually identical to the 47-page manuscript.  The only

8  differences are altered margins and insignificant changes in grammar, punctuation, word choice,

9  and page layout that do not change the meaning of the text.  Accordingly, Stewart's admission

10  that the 47-page manuscript is not even substantially similar to the accused films precludes any

11  possibility that the virtually identical 29-page draft is strikingly similar to them.

12       Stewart's admissions concerning substantial and striking similarity do not extend to the

13  synopsis, character list, character descriptions, and illustrations that are included in the 45-page

14  instrument, or to "The Making of The Third Eye.  Although her admissions do not encompass

15  these materials, they are not properly before the court on these motions, because only Stewart's

16  testimony, which has been precluded, authenticates them.  Even were this not the case, Stewart

17  does not contend that any element uniquely found in the synopsis, character list, character

18  descriptions, illustrations or "The Making of the Third Eye" is substantially or strikingly similar

19  to elements found in the Terminator films.[126]  Rather, she identifies and relies on similarities

20  _____

21       [122]See Boren Decl., Exh. S at 209.

22       [123]*Id.* at 209-10.

23       [124]*Id.* at 210.

24
25       [125]*Id.* at 209-10.

26       [126]See Pl.'s Terminator Opp. at 13.  The similarities Stewart identifies are a single,
   common line of dialogue, plot elements common to the manuscript and the Terminator films,
27  setting, and a similarity between Stewart's character, "Iceus," and the Terminator character,
   "Sarah Connors."  Although Stewart asserts one similarity related to character descriptions,
28  "Iceus" is not mentioned in the character descriptions that are included in the 45-page instrument.

between the Terminator films, on the one hand, and her treatment and manuscript, on the other. Although the synopsis could be said to contain plot lines and settings similar or identical to those found in the treatment and the manuscript, Stewart's admission that the 47-page manuscript is not substantially or strikingly similar necessarily encompasses any similarities found in the synopsis. Her admissions, therefore, conclusively establish that there are no striking similarities between the works.

As defendants have adduced evidence demonstrating the absence of a triable issue of fact on the question of striking similarity, Stewart – who bears the burden of proof at trial – must produce evidence raising an issue of fact in this regard. Notwithstanding her conclusive admissions concerning lack of similarity, Stewart argues that genuine issues of fact remain, citing (1) an internet article that notes plot similarities between the Matrix films and the Terminator films,[127] and (2) her hearsay statement that FBI agents told her the accused films were copied from her work.[128] Because Stewart offers the internet article and the hearsay statements of the FBI agents through her own testimony, and because the court has precluded that testimony, the evidence cannot be considered in assessing whether triable issues of fact defeat summary judgment.

The internet article, moreover, is independently inadmissible. As noted earlier, articles of this type are hearsay under Rule 801(c) when offered for the truth of the matter asserted. See *Larez, supra*, 946 F.2d at 642; *United States ex rel. Woods, supra*, 2002 WL 1905899 at * 1, n. 1; *In re Columbia Securities Litigation, supra*, 155 F.R.D. at 474. Even were it admissible, the fact that the article notes plot similarities between the Matrix films and Terminator films does not support a reasonable inference that both series were copied from Stewart's work. Assuming the article asserted that one series copies the other (which it does not), it would have no tendency to prove the truth of Stewart's allegation that the Terminator films copied her work. The court has also found that the alleged statements of FBI agents recounted by Stewart in her declaration are

---

[127]Stewart Matrix Decl., Exh. 6.

[128]Stewart Terminator Decl., ¶ 8.

inadmissible hearsay.  Even were this not the case, there is no evidence that the agent or agents with whom Stewart spoke compared her work and the Terminator films and concluded that they were "strikingly similar."  None of this evidence, therefore, even if admissible, would raise a triable issue of fact regarding striking similarity.

Stewart criticizes the Terminator Defendants' failure to submit the accused films and their underlying source materials as evidence in support of their summary judgment motion.  She contends that they "have failed to offer any evidence regarding access to, and substantial similarity between the original manuscript . . . and [their] films."  As a consequence, she asserts, they "have failed to sustain their burden on summary judgment."[129]  Defendants can prevail on summary judgment, however, merely by pointing out that there is an absence of evidence to support Stewart's case.  *Celotex*, *supra*, 477 U.S. at 323.  Stewart has the burden of proof on striking similarity.  By failing to proffer the allegedly infringing films for comparison with her works, and by failing to adduce any other admissible evidence of striking similarity, she has failed to satisfy that burden.  The Terminator Defendants are thus entitled to have summary judgment entered in their favor on Stewart's copyright infringement claims.[130]

---

[129]Pl.'s Terminator Opp. at 20.

[130]In addition to relying on Stewart's admissions, the Terminator Defendants proffer the declaration and expert report of Mark Rose, an English professor at the University of California at Santa Barbara.  Rose has previously testified in several matters regarding the substantial or striking similarity of various works.  (See Declaration Of Mark Rose In Support Of The Terminator Defendants' Motion For Summary Judgment And The Terminator Defendants' Motion For Summary Judgment ("Rose Decl."), ¶ 1.)  Based on his comparison of Stewart's works and the accused works, as well as earlier literary and film works that contain elements found both in Stewart's works and the accused films, Rose opines that Stewart cannot establish that the protectable expression in her works is substantially similar to that in the accused works.  (See *id.*, Exh. 2.)  Plaintiff objects to the Rose report on the basis that it lacks foundation and violates the best evidence rule.  (Pl.'s Terminator Opp. at 12.)  Rose has laid an adequate foundation for his opinions, in that he describes his methodology and details the sources on which he relied.  Although Rose's description of the accused films is not admissible to prove their contents (see FED.R.EVID. 1002), an expert may rely on materials not admitted into evidence in forming an opinion (see FED.R.EVID. 703).  Stewart's objections that the report is "conjectural," "speculative" and "conclusory" are merely complaints that Rose offers an opinion.  An expert may, of course, offer opinion testimony.  See FED.R.EVID. 703.  Rose's report, therefore, is

ii.     **Whether Plaintiff Can Establish That Her Works Are Strikingly Similar To Matrix 1, 2, and 3**

As respects the Matrix films, Stewart has admitted that Matrix 1 is neither strikingly nor substantially similar to her treatment and the 47-page manuscript;[131] that Matrix 2 is neither strikingly nor substantially similar to her treatment and 47-page manuscript;[132] and that Matrix 3 is neither strikingly nor substantially similar to her treatment and 47-page manuscript.[133] She has also admitted that the protectable expression in "The Third Eye" is not substantially similar to the protectable expression in Matrix 1, 2, and 3,[134] and that the Wachowskis independently created Matrix 1, 2, and 3.[135] Although the admissions relate only to the six-page treatment and the 47-page edited manuscript, they preclude a finding that the 29-page draft, which forms the core of the 45-page instrument and which is virtually identical to the 47-page manuscript, is strikingly similar to the accused films.

As with her admissions regarding the Terminator films, Stewart's admissions concerning the similarity of her works to the Matrix films do not extend to the synopsis, character list, character descriptions and illustrations that are included in the 45-page instrument. Nor do they encompass "The Making of the Third Eye." As noted earlier, the 45-page instrument is not properly before the court, since it is not attached to Stewart's complaint, and Stewart proffers only her own testimony, which has been precluded, to authenticate it. Were the court to consider the

---

admissible. The court need not rely on Rose's declaration and report to conclude that Stewart has failed to raise a triable issue of fact regarding striking similarity, however, because her admissions are conclusive on the issue, and because she failed to submit a copy of the allegedly infringing films in opposition to defendants' motions.

[131]See Boren Decl., Exh. S at 266-67.

[132]*Id.* at 267.

[133]*Id.*

[134]*Id.* at 267-68.

[135]*Id.* at 288, 309.

1   documents that comprise the 45-page instrument, however, it would find that Stewart has not

2   raised a triable issue of fact concerning striking similarity.

3         In her opposition, Stewart does not contend that there are substantial or striking similarities

4   between unique elements of her synopsis or illustrations and the Matrix films.[136]  Rather, she

5   contends that there are substantial similarities between her description of the characters "X-sers,"

6   "Kev," "Vashta," "Trifina," "Awn," and "Trev"[137] and counterpart characters in the Matrix

7   films, namely, "Tank," "Apoc," "Morpheus," "Trinity," "Cypher," and "Mouse." She further

8   contends that "Zonia," a name she includes in her character list without description, is

9

10  _____

11  [136]As with the Terminator films, although the synopsis could be said to contain plot lines
    and settings similar or identical to those found in the treatment and the manuscript, Stewart's
12  admission that the 47-page manuscript is not substantially or strikingly similar necessarily
    encompasses any similarities found in the synopsis.
13

14  [137]The relevant character descriptions read, in their entirety:

15  "X-sers -    Ikahn's second in command. 24 years old, 6'2", and weighed 200 lbs. Muscle

16              bounded . . . balded with piercing eyes (ear-ring in one ear) . . . He was cold
              logics . . . three abilities"
17
    "Kev -       24 years old . . . 6'4", weighed 230 lbs. . .  Strong . . . With a hard look.
18              Extremely well-built. Has one ability and no-self discipline. . . He was raw and
              primitive (Mohawk hair-do)"
19

20  "Vashta -    45 years old, weighed 168 lbs. 6' feet tall (with a beard). Strong[ ] character and

21              a good advisor. He participated when the times called for."

22  "Trifina -   5'7" weighed 120 lbs. Pure of heart . . . Playing always a symbolic (Major) part

23              in the background, but with awareness of all that takes place . . . Like an Angel"

24  "Awn -       22 years old . . . 6'1", weighed 175 lbs. Passive in nature. He went alon[g] with

25              whatever was decided (to a certain extent). He keeps to himself but doesn't miss
              a thing. No abilities."
26
    "Trev -      The last member. . . 6" [sic] tall, slender, weighed 165 lbs. Has long shoulder
27              length hair with kiddish features. He was warm hearted and well loved by all. He
              was the mortal support to Ikahn and the rest . . . No abilities. . . He was just
28              beginning the path. . . . 20 years old."

46

1  substantially similar to a character in the Matrix films named "Switch."

2      Stewart bears the burden of proof on the issue of striking similarity.  The only evidence

3  she submits to prove the similarity of her characters to those found in the Matrix films is a single

4  page that contains photographs of nine Matrix 1 characters.[138]  This exhibit is inadmissible because

5  it is proffered through Stewart's testimony.  Even were the court to consider the exhibit,

6  moreover, it would conclude that it does not raise a triable issue of fact regarding the striking

7  similarity of Stewart's works and the Matrix films.  Since the photographs depict only the faces

8  of the Matrix 1 characters, it is impossible for the court to discern whether there are similarities

9  in height, weight, or personality between the two sets of characters.  The distinct facial features

10 that Stewart ascribes to certain of her characters are not evident in the exhibit.  X-sers'

11 counterpart, Tank, for example, is not bald and there is no earring apparent in the photograph.

12 The photograph is not sufficiently clear to determine if Tank has "piercing" eyes.  Kev's

13 counterpart, Apoc, does not appear to have a "hard look," and plainly does not have a Mohawk

14 hairdo.  Vashta's counterpart, Morpheus, does not have a beard.  Stewart's descriptions of Trifina

15 and Awn do not make reference to facial features, and so cannot be compared to the photographs

16 of Trinity and Cypher.  Although the photograph of Trev's counterpart, Mouse, is of poor

17 quality, and it appears he may have "kiddish" features, it is quite clear that he has short rather

18 than shoulder-length hair.  Finally, it is impossible to compare Zonia, who is mentioned only by

19 name, to the photograph of Switch.  Because no reasonable finder of fact could find that these

20 photographs, which bear little resemblance to Stewart's character descriptions, establish striking

21 similarity between the Matrix films and Stewart's work, they do not raise a triable issue of fact

22 regarding striking similarity.[139]

---

24      [138]See Stewart Matrix Decl., Exh. 10.

25      [139]Although Stewart proffers no evidence regarding the stature, weight or personality traits
26 of the Matrix characters, her opposition brief summarizes these characteristics.  (Pl.'s Matrix
   Opp. at 14-15.)  Stewart's brief is not evidence.  Her description of the Matrix characters,
27 moreover, is supported by no evidence save the conclusory assertion that "[a]ll of [her] characters
   are identical [to] the characters in [the] Matrix 1 film as far as the physical attributes and
28 abilities."  (See Stewart Matrix Decl., ¶ 12.)  Even had Stewart's testimony not been precluded,

1    Stewart identifies other purported similarities between the Matrix films and her treatment

2    and manuscript.  As Stewart's admissions are conclusive evidence that there is no substantial or

3    striking similarity between these works and the Matrix films, however, the claimed similarities

4    cannot be considered by the court.  See FED.R.CIV.PROC. 36(b); *American Auto Ass'n.*, *supra*,

5    930 F.2d at 1120.

6    To prove striking similarity, Stewart also relies on (1) an internet article noting plot

7    similarities between the Matrix films and the Terminator films,[140] and (2) a statement by Larry

8    Wachowski quoted in *Time Magazine* to the effect that "[*The Matrix* is] a story about

9    consciousness . . . child's perception of an adult world.  *The Matrix* is about the birth and

10   evolution of consciousness."[141]   Because these materials are introduced through Stewart's

11   testimony, which has been precluded, they cannot be considered.  Additionally, the court has

12   found that the internet article is independently inadmissible hearsay.  See FED.R.EVID. 801(c);

13   *Larez*, *supra*, 946 F.2d at 642; *United States ex rel. Woods*, *supra*, 2002 WL 1905899 at * 1, n.

14   1; *In re Columbia Securities Litigation*, *supra*, 155 F.R.D. at 474.  In any event, the article does

15   not address Stewart's works, and does not give rise to an inference that both series were copied

16   from those works.

17   The quotation from Larry Wachowski concerning the "evolution of consciousness" is also

18   inadmissible.  Although the quotation itself might be deemed the admission of a party opponent,

19   the repetition of the statement by a magazine reporter is hearsay.  See *Larez*, *supra*, 946 F.2d at

20   642.  Even if it were considered, the statement would not create a triable issue of fact defeating

21   summary judgment.  Stewart contends that Wachowski's statement is strikingly similar to a

22   passage in her treatment: "The proposed science fiction film deals with Earth during the year 2110

23   _____

24   it would not be admissible to prove the contents of the Matrix films, as those films have not been

25   introduced into evidence.  See FED.R.EVID. 1002.  As a result, Stewart has failed to adduce

     evidence from which a reasonable trier of fact could find that the Matrix characters are strikingly

26   similar to her character descriptions.

27   [140]Pl.'s Matrix Opp. at 17-18; Stewart Matrix Decl., Exh. 6.

28   [141]Pl.'s Matrix Opp. at 18; Stewart Matrix Decl., Exh. 7.

A.D.  By that time planet Earth had experienced horrible nuclear wars, and a Spiritual Evolution was underway.  Man was finally moving from the unconscious to the conscious stages of spiritual development."[142]  The relevant comparison for copyright infringement purposes, however, is between Stewart's literary works and the Matrix films.  The quotation Stewart cites is not from the films, but from a magazine article regarding the films.

Second, the "evolution of consciousness" is an idea rather than the protectable expression of that idea.  See *Sid & Marty Krofft*, *supra*, 562 F.2d at 1163 ("It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself.")  It is not sufficient that the ideas embodied in two works be similar.  Rather, the trier of fact must determine "whether there is substantial similarity in the expressions of the ideas so as to constitute infringement."  *Id*. at 1164; see also *Cavalier*, *supra*, 297 F.3d at 823 ("Copyright law only protects expression of ideas, not the ideas themselves"); *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1398 (9th Cir. 1997) ("'Substantial similarity' refers to similarity of expression, not merely similarity of ideas or concepts").

As noted earlier, to assess whether works express an idea in similar fashion, courts employ an extrinsic and intrinsic test.  The "extrinsic test" contemplates an objective comparison of specific expressive elements in the parties' works, while the intrinsic test requires a subjective comparison from the point of view of an ordinary, reasonable audience.'"  See *Cavalier*, *supra*, 297 F.3d at 822 (quoting *Kouf*, *supra*, 16 F.3d at 1045).  Because Stewart has not submitted copies of the Matrix films in opposition to defendants' motion for summary judgment, these comparisons cannot be made.[143]  As a result, she cannot raise a triable issue of fact regarding the

---

[142]Pl.'s Matrix Opp. at 18; Stewart Matrix Decl., Exh. 1.

[143]The extrinsic and intrinsic tests are used to assess not only substantial similarity but striking similarity as well.  See, e.g., See *Chiate v. Morris*, 972 F.2d 1337, 1992 WL 197591, *7, n. 4 (9th Cir. Aug. 17, 1992) (Unpub. Disp.) (discussing the extrinsic and intrinsic tests, and noting that if plaintiff cannot prove access, "a 'striking similarity' between the works at issue will give rise to an inference of copying"); *Thimbleberries, Inc. v. C&F Enterprises, Inc.*, 142 F. Supp. 2d 1132, 1139 (D. Minn. 2001) (using the Eighth Circuit's extrinsic/intrinsic test to assess

1   striking similarity of the manner in which the idea of evolving consciousness is expressed in her

2   works and the Matrix films.

3          As noted earlier, Stewart has the burden of proof on striking similarity.  By failing to

4   proffer the allegedly infringing films for comparison with her works, and by failing to adduce any

5   other admissible evidence of striking similarity, she has failed to satisfy that burden.  The Matrix

6   Defendants are thus entitled to have summary judgment entered in their favor on Stewart's

7   copyright infringement claims.[144]

8          **D.      Whether Defendants Are Entitled To Summary Judgment On Plaintiff's RICO**

9                  **Claims**

10         Defendants contend that Stewart's RICO claims "fail as they are based upon, and rise or

11  fall with, the copyright claims."[145]  Stewart's RICO claims assert violations of 18 U.S.C.

12  §§ 1962(c) and (d).   To prevail on her RICO claims, Stewart must prove that defendants

13  (a) received income derived from a pattern of racketeering activity, and used the income to

14  acquire or invest in an enterprise in interstate commerce; (b) acquired or maintained an interest

15  in, or control of, an enterprise engaged in interstate commerce through a pattern of racketeering

16  activity; (c) caused an enterprise engaged in interstate commerce, by which they were employed,

17  to conduct or participate in a pattern of racketeering activity; or (d) conspired to engage in any

18  of these activities.  18 U.S.C. §§ 1962; see also *United States v. Turkette*, 452 U.S. 576, 582

19  (1981) ("[i]n order to [prevail] under RICO, [a party] must prove both the existence of an

20  'enterprise' and the connected 'pattern of racketeering activity.'  The enterprise is an entity. . .

_____

22  striking similarity).

23         [144]Stewart also proffers declarations filed in *In re the Marriage of Thea Bloom and
24  Laurence Wachowski*, Los Angeles Superior Court Case No. BD 380 496 (Stewart Matrix Decl.,
    Exhs. 8, 9), in support of a contention that Larry Wachowski made inconsistent statements during
25  divorce proceedings regarding the dates on which the Matrix films were written.  Whether the
    first Matrix film was written before or after October 26, 1993 has no relevance to the issues in
26  this case, however, as Wachowski admits that the film was written in 1993, after Stewart's
27  purported submission of "Third Eye" to him and his brother in 1986.

28         [145]Terminator Defs.' Mot. at 24.

1   . The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined

2   by the statute"); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir. 1997) (plaintiff must

3   allege "(1) the conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity").

4        An "enterprise" includes "any individual, partnership, corporation, association, or other

5   legal entity, and any union or group of individuals associated in fact although not a legal entity."

6   18 U.S.C. § 1961(4).  Racketeering activity is any act indictable under the various provisions of

7   18 U.S.C. § 1961.  *Id.*  A "pattern" requires the commission of at least two acts of "racketeering

8   activity" within a ten-year period.  18 U.S.C. § 1961(5).

9        In addition to proving that defendants conducted an enterprise engaged in a pattern of

10  racketeering activity, Stewart must also prove that their conduct was both the "but for" and

11  proximate cause of a concrete financial injury.  *Resolution Trust Co. v. Keating*, 186 F.3d 1110,

12  1117 (9th Cir. 1999); *Forsyth, supra*, 114 F.3d at 1481 (citing *Imagineering, Inc. v. Kiewit

13  Pacific Co.*, 976 F.2d 1303, 1311 (9th Cir. 1992), cert. denied, 507 U.S. 1004 (1993)).  The only

14  financial injury Stewart has alleged is damage flowing from the infringement of her literary

15  works.

16       The "predicate acts" the Terminator Defendants allegedly committed are acts of mail and

17  wire fraud on the part of Fox and acts of "criminal copyright infringement" by Cameron and

18  Hurd.  The predicate RICO offenses the Matrix Defendants allegedly committed are criminal

19  copyright infringement and alleged mail fraud.  The mail fraud allegations are based on the

20  Wachowskis' alleged placement of an advertisement in a national magazine that they knew would

21  elicit responses via interstate mail.  As plaintiff has failed to adduce any admissible evidence that

22  any of the individuals who created the Terminator films had access to her literary works, she has

23  failed to show that Fox's use of the wires and mails was either a "but for" or proximate cause of

24  her alleged injury, and the Terminator Defendants are entitled to summary judgment on this aspect

25  of Stewart's RICO claims as a result.  Similarly Stewart's mail fraud allegations against the

26  Wachowskis fail because her admission that the purported advertisement does not exist

27  conclusively establishes that there was no use of the mails by those defendants.  Finally, because

28  Stewart has failed to adduce sufficient evidence to raise a triable issue of fact regarding

51

1      defendants' infringement of her copyrighted works, her criminal copyright infringement

2      allegations against all defendants likewise fail. See 18 U.S.C § 2319; 17 U.S.C. § 506(a).

3           Accordingly, the Terminator Defendants and the Matrix Defendants are entitled to have

4      summary judgment entered in their favor on Stewart's RICO claims.[146]

5      **E.**     **The Terminator Defendants' Statute Of Limitations And Laches Defenses**

6           The Terminator Defendants contend that Stewart's claims against Cameron and Hurd are

7      barred by the applicable statue of limitations and that her claims against all Terminator Defendants

8      are barred by the doctrine of laches.

9           The statute of limitations for claims brought under the Copyright Act is found in 17 U.S.C.

10     § 507(b), which provides that "[n]o civil action shall be maintained under the provisions of this

11     title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b).[147]

12     "A cause of action for copyright infringement accrues when one has knowledge of a violation or

13     is chargeable with such knowledge." *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th

14     Cir. 1994).  "[U]nder *Roley*, the statute of limitations does not prohibit recovery of damages

15     incurred more than three years prior to the filing of suit if the copyright plaintiff was unaware of

16     the infringement, and that lack of knowledge was reasonable under the circumstances." *Polar*

17     *Bear Prods. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004).  The Terminator Defendants

18     renew their contention, raised previously in a motion to dismiss, that Stewart's purported failure

19     to discover the facts underlying her infringement claims against Cameron and Hurd prior to April

20

21

22

---

23         [146]Stewart's RICO claims also fail to state a claim for the reasons set forth in the court's

24    contemporaneously filed order on defendants' motion to dismiss the second amended complaint.

25         [147]The three year statute of limitations governing copyright infringement actions also

26    governs claims for declaratory relief regarding copyright ownership or infringement.  See, e.g., *Meat Loaf Enterprises Inc. v. Sony Music Entertainment, Inc.*, No. 96 Civ. 0991(MGC), 1997

27    WL 598410, * 5 (S.D.N.Y. Sept. 25, 1997) (noting that courts have "not limited the application of the three-year statute of limitations to infringement claims [but have] applied it to claims

28    seeking declarations of copyright ownership").

1  24, 2000 is unreasonable as matter of law.[148]  Defendants also renew their argument, raised

2  previously in a motion to dismiss, that Stewart's claims are barred by the doctrine of laches, "an

3  equitable defense that prevents [suit by] a plaintiff, who with full knowledge of the facts,

4  acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942,

5  951 (9th Cir. 2001) (internal quotations and citations omitted).  Because the court has found the

6  Terminator Defendants are entitled to judgment as a matter of law on all of Stewart's claims, it

7  need not address the applicability of the statute of limitations or the doctrine of laches.[149]

8

9

10  ───────────────

11  [148]Terminator Defs.' Mot. at 19-21; see also Order Denying Defendants' Motion To Dismiss Plaintiff's First Amended Complaint Based On The Statute Of Limitations And Laches.

12  [149]In her opposition, Stewart requests that the court reopen discovery pursuant to Rule 56(f)

13  so that she may take discovery related to these defenses.  (Pl.'s Terminator Opp. at 18-19.)

14  Because the court has found on multiple occasions that Stewart has not prosecuted this action and pursued discovery diligently, her Rule 56(f) motion must be denied.  (See Order Denying

15  Plaintiff's *Ex Parte* Application for Continuance of Case Management Dates at 5; see also Order

16  Denying Plaintiff's Motion for Relief Pursuant to Rule 60(b).)  Additionally, since the court's decision of defendants' summary judgment motion does not turn on the affirmative defenses,

17  Stewart cannot show that the information she seeks would preclude summary judgment. Accordingly, Stewart's Rule 56(f) request is denied.

18      In seeking additional discovery, Stewart contends that she failed to conduct discovery

19  because defendants had not yet filed an answer, and she did not know what allegations would be denied and what affirmative defenses would be asserted.  This explanation conflicts directly with

20  earlier explanations Stewart has offered for her failure to propound discovery.  In plaintiff's initial application to reopen discovery, she attributed her failure to conduct any timely discovery to

21  changes in counsel, the health problems of one of her attorneys, the time that was required to

22  respond to defendants' motion to dismiss and the effort expended in providing partial responses to defendants' discovery.  (See Plaintiff's *Ex Parte* Application To Continue The Discovery,

23  Motion Cut-Off Dates, Etc., And/Or Trial at 8.)  In her motion for reconsideration of the court's

24  denial of the application, Stewart asserted that her failure to conduct discovery was due to her attorneys' negligence. See (Plaintiff's Motion To Continue Case Management Dates Pursuant To

25  Rule 60(b) at 1-2.) Stewart now offers a new and different explanation for her failure to complete

26  discovery – the absence of a responsive pleading.  Given her earlier representations, and the fact that Stewart knew, from argument of the motions to dismiss, that defendants denied her claims

27  of access and copying, and asserted affirmative defenses based on the statute of limitations and

28  laches, it is clear that Stewart's failure to complete timely discovery was not caused by the lack of a responsive pleading.

1

## III.  CONCLUSION

2   For the foregoing reasons, the court grants both the Terminator Defendants' and the Matrix

3 Defendants' motions for summary judgment on all claims.

4

5 DATED:  June 13, 2005

         _Margaret M. Morrow_

6           MARGARET M. MORROW
          UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28